## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

_____
                                        )
BRIAN SHEVLAND,                         )
                                        )
        Plaintiff,                      )
                                        )
    vs.                                 )
                                        )
PATRICK ORLANDO and                     )        Case No.: _____
ARC GLOBAL INVESTMENTS II, LLC,         )
                                        )
                                        )
        Defendants.                     )
_____)

## COMPLAINT AND REQUEST FOR DAMAGES, SPECIFIC PERFORMANCE, AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

By this Action, Plaintiff Brian Shevland ("Shevland") seeks specific performance or, alternatively, monetary damages, along with declaratory relief, from Patrick Orlando ("Orlando") following Orlando's breach of their written agreement to together launch investment in special purpose acquisition companies, or SPACs,[1] and share equally in the benefits by having the right "to invest up to equal amounts in all current and future SPAC opportunities, whether internal or external, at the same terms (same price/share)" (the "SPAC Business Agreement" or "Agreement").  Orlando thereafter exploited Shevland's expertise, business team, investor network, and capital to build out and close SPAC deals, including the recently launched Digital World Acquisition Corporation ("DWAC"), which later announced a merger with Trump Media and Technology Group ("TMTG").  Shevland was instrumental in securing TMTG as well as raising capital for DWAC, thereby ensuring DWAC's success and subsequent enormous growth

---

[1] SPACs are explained more thoroughly in Paragraphs 10-11 of this Complaint.

in value.  Prior to DWAC's initial public offering ("IPO"), however, Orlando froze out Shevland and violated their agreement, instead keeping all the available shares for himself.

According to recent SEC filings, following DWAC's IPO, Orlando now personally controls at least 6,623,484 shares in DWAC, the vast majority of which are "founder" shares he purchased for $0.003 each.  Based on current valuations, those shares are now worth approximately $400 million.  Shevland, by contrast, who was entitled to purchase the same number of shares on the same terms as Orlando, fulfilled his obligations under the SPAC Business Agreement by helping Orlando successfully launch and raise capital for DWAC but was robbed of his shares.  As such, Shevland brings claims against Orlando for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and declaratory relief.

## PARTIES

1.      Plaintiff Brian Shevland is an individual with a residence in Humacao, PR.

2.      Defendant Patrick Orlando is an individual with a residence in Miami, FL.

3.      Defendant ARC Global Investments II, LLC ("ARC") is a Delaware limited liability company with a principal place of business at 78 SW 7th Street, Miami, FL 33130. Orlando, a resident of Florida, is the managing member of ARC.  Upon information and belief, Plaintiff is unaware of any additional members of ARC; if ARC does have any additional members, Plaintiff has no basis to believe they would be residents of Puerto Rico.

## JURISDICTION AND VENUE

4.      The Court has personal jurisdiction over Orlando, who is a resident of Florida.

5.      The Court has personal jurisdiction over ARC, because ARC's principal place of business is in Miami, Florida.

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that complete diversity of citizenship exists between Plaintiff and Defendants. Specifically, Plaintiff is a citizen of Puerto Rico and Defendants are citizens of Florida and Delaware.

7. The amount in controversy in this suit exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest, costs and attorney's fees.

8. Venue is proper in this District because: (i) pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to the claims occurred in this District; (ii) upon information and belief, Defendants regularly do or solicit business in this District; and (iii) pursuant to 28 U.S.C. § 1391(b)(3), Defendants are subject to personal jurisdiction in this District with respect to this action.

## **BACKGROUND**

9. In December 2020, Shevland was introduced to Orlando by a friend who explained that Orlando needed help and resources in setting up a serial "SPAC" business.

10. A "SPAC" is a special purpose acquisition company created for the purpose of acquiring or merging with an existing company. Often referred to as "blank check" companies, SPACs raise money from investors without specific acquisition targets in mind. Investors are generally informed about the SPAC's Board of Directors and the industries or areas that the SPAC intends to target. Once the SPAC is fully funded and completes its IPO, it will thereafter identify and merge with a target company, and shareholders in the original SPAC will receive replacement shares in the newly merged company (often referred to as the "de-SPACing process"). This saves the target company time and money as compared to a traditional IPO.

11.     "Founder shares" are shares purchased, typically at a price below what the eventual IPO share price will be, by early investors in a SPAC.  These pre-IPO shares have the potential to appreciate in value exponentially if the SPAC finds and merges with a successful, high-value target.  On the other hand, this investment is not without potential downside, as purchasing founder shares puts capital at risk and, in the event of a failed merger, investors stand to lose some or all of their investment.

12.     Prior to his introduction to Shevland, Orlando was a little-known financial advisor who was in danger of having his securities licenses lapse because he hadn't been registered with a broker/dealer for approaching two years.  Orlando also lacked capital, a team, an established investment business and even his own office.  Orlando also had minimal prior experience with SPACs.  Indeed, his first attempted SPAC, Yunhong International, did not complete a merger and is now in liquidation.

13.     On the other hand, Shevland has had a successful career of over twenty years operating as an entrepreneur and innovator across the financial services industry.  Founder and CEO of an institutional asset management firm, Shevland has been recognized as a top tier portfolio manager by several of the industry's most respected publications and has also received industry recognition for his quantitative research. In addition to his work as a portfolio manager, Shevland and his team have raised well over $5 billion for various projects and engagements. Through his years of experience, Shevland has cultivated a broad and deep network of investors and business contacts—all of which made him immensely valuable as a potential partner to an upstart like Orlando.

**Shevland and Orlando Agree to Form a "Serial SPAC Business"**

14.    In December 2020, Shevland was introduced to Orlando.    After multiple discussions, Orlando proposed partnering with Shevland to build what he termed a "serial SPAC business."  A true copy of a communication regarding this via WhatsApp, an electronic messaging service, is attached hereto as Exhibit A.

15.    Thereafter, on or about December 21, 2020, in ongoing discussions, Orlando and Shevland reached the SPAC Business Agreement, which made them equal partners in future SPAC opportunities.  Under the SPAC Business Agreement, Shevland agreed to utilize his experience, network, and goodwill to make the parties' joint SPAC undertakings successful.  Orlando, for his part, was concerned that he would not be able to purchase as many founder shares in those SPACs as Shevland because he lacked the necessary resources.  Therefore, he proposed, and Shevland accepted, an agreement that both parties would have the right (but not the obligation) to invest their own capital in founder shares of each SPAC at the same price and to purchase the same number of shares.  In other words, if one party was purchasing 1 million shares at $2 per share, the other party would have the right to do the same.  On the other hand, if either party lacked the resources or liquidity at the time of making the investment, he had no obligation to purchase the full $2 million worth of shares but could purchase as many shares as they would like up to 1 million shares at the same economics, $2 per share.  These terms were agreed to by the parties on or about December 21, 2020.

**Orlando Reneges on the First SPAC**

16.    In January 2021, pursuant to their agreement, Orlando proposed that Shevland invest in their first SPAC, Benessere Capital Acquisition Corporation ("BENE"), at $2 per share, which Orlando stated was the price per share that he had paid.  Shevland thereafter signed a

subscription agreement for BENE, agreeing to purchase 250,000 founder shares of BENE for $500,000.  In addition, Orlando extended a seat on the BENE Board of Directors to Shevland, which Shevland accepted. A true copy of Shevland's BENE Board of Directors nomination letter is attached hereto as Exhibit B.

17.     On or about January 19, 2021, however, Orlando reneged on the parties' agreement regarding BENE and informed Shevland that the 250,000 shares would <u>not</u> be available because it would reduce the number of shares committed to Orlando personally.  Instead, Orlando "offered" Shevland 50% of the shares he had originally promised (125,000 shares for a total price of $250,000) and ultimately suggested that the other 50% of Shevland's committed capital could be diverted to a different future SPAC known as Maquia Capital Acquisition Corporation ("MACQ"), also at the same economics as Orlando of $2 per share.

18.     Between January 20-22, 2021, Shevland repeatedly expressed his displeasure with Orlando's reversal of the BENE terms in emails, stating:

> We came to terms on a[n] agreement that I would invest $500,000 for 250,000 shares blus [sic] a small allotment of Director shares…  Based on the understanding, I shifted around an investment portfolio causing taxes, expenses, and candidly a decent amount of work [.]
>
> How I would have handled the situation is to say 'I am going to honor our agreement because I said I would but you need to commit to me that I get the same terms on the SPACs we do together in the future…

True copies of Shevland's emails from January 20, 2021 and January 22, 2021 are attached hereto as Exhibits C and D, respectively.

19.     To induce Shevland to continue with the joint SPAC enterprise, Orlando reiterated to Shevland that <u>all future</u> SPACS going forward—exclusive of BENE—would be shared between Shevland and Orlando on equal terms.  Having witnessed Orlando renege on the SPAC Business Agreement already, however, Shevland insisted that the Agreement be memorialized in writing.

**The SPAC Business Agreement is Reduced to Writing**

20.     Between January 31, 2021 and February 2, 2021, Orlando drafted a "term sheet" designed to capture the precise terms of the SPAC Business Agreement.  On February 2, 2021, Orlando (not Shevland) added a paragraph to this term sheet explicitly memorializing his agreement that he and Shevland would share in all future SPACs together at equal terms.  Specifically, he wrote:

> Subsequent SPAC: Brian and Patrick will move to immediately embark on launching 2-5 SPACs over next 3 years, first a new SPAC to raise $100-$200MM, subsequent SPAC sizes TBD. **In these SPAC, Brian and Patrick will be parri [sic] passu equal weighted co-sponsors; in that the two parties will have the opportunity to invest equal amounts at equal terms but will not be required to meet those thresholds.**

A true copy of Orlando's February 2, 2021 email, along with attachment, is attached hereto as Exhibit E (emphasis added).

21.     After further negotiations, on February 10, 2021, Shevland finalized the terms of the Agreement by email, which provided as follows:

> Patrick,
>
> I appreciated our call and I am very ready to move on and put this behind us to focus on the future.  I want to make sure that my understanding of the call we had today is memorialized and agreed upon to avoid any confusion by either party.  If we agree to everything we discussed on the call, I will sign the subscription document tonight, wire the money tomorrow, and we will start building something spectacular together immediately.
>
> For the purposes of this agreement to move forward, my understanding is as follows:
>
> 1) I am sending you $500,000 for the sole intended purpose of acquiring 250,000 shares of BENE.
>
> 2) Over the next few weeks, you are investing your own personal capital in other SPACs and if those SPACs successfully IPO prior to March 31st, 2021, and you obtain a price/share less than or equal to the $2.00/share, I will be able to maintain the 250,000 shares of BENE.

3) However, if the other SPAC investments you invest into are not able to IPO, you have the right to send me back an amount of capital up to $200,000 prior to March 31st, 2021, and my shares in BENE would be reduced pro rata.  The capital that remains at BENE would still purchase as many shares as possible at a cost of $2/share.

**4) Patrick and Brian will have the opportunity but not the obligation to invest up to equal amounts in all current and future SPAC opportunities, whether internal or external, at the same terms (same price/share).  In the event that Brian and his network are able to raise more sponsor capital in order to reduce the price per share, both Brian and Patrick will share equally in the price/share reduction, the shares will not be bifurcated.  This right does not extend to BENE since those terms are outlined in the subscription agreement but would apply to all other SPAC opportunities.**

5) You will process whatever paperwork is necessary to add me as a Director to BENE as soon as possible, so that I am officially added both to the legal structure and to the website no later than February 16th.  This is important based upon meetings I have already arranged for February 17th.  I will immediately begin working with Eric to streamline various processes, evaluate opportunities, and provide additional leads and relationships to our team.

6) I will onboard your licenses with my B/D asap, under the terms we discussed, and I will cover all of the standard fees of joining the firm on your behalf.  The intention would be for you to build and manage an investment Banking operation.

Please review at your earliest convenience.  If you agree that these are the terms we have agreed to, please confirm in an email and I will sign and send the subscription documents and prepare the wire first thing tomorrow morning.

A true copy of Shevland's February 10, 2021 email is attached hereto as Exhibit F (emphasis added).

22.     Orlando accepted the terms of the Agreement by return email on February 10, 2021, in which he wrote "**we are agreed**."  A true copy of Orlando's email confirming Shevland's terms is attached hereto as Exhibit G.

23.     Shevland thereafter responded by email in pertinent part:

> Thank you for your confirmation of agreement.  You are right, none of the terms are different than what we discussed, just wanted to put the most important points that we discussed in writing. . .

A true copy of Shevland's February 10, 2021 email is attached hereto as Exhibit H.

24.     The very next day, February 11, 2021, satisfied that his agreement with Orlando had been reduced to writing and his interests were protected, Shevland wired $500,000 for his acquisition of BENE and MACQ shares pursuant to the SPAC Business Agreement.

25.     To date, Shevland has neither received 250,000 shares in BENE nor has his $200,000 in capital been returned to him, as required by the SPAC Business Agreement.

**The Creation of DWAC**

26.     On May 26, 2021, Orlando filed a Form S-1 with the Securities and Exchange Commission indicating the intention to publicly offer shares of DWAC, a SPAC for which he and ARC had become the sponsors.  Orlando is the Chairman and CEO of DWAC.

27.     DWAC was a "future SPAC opportunit[y]" that fell within the ambit of the SPAC Business Agreement.  As such, Shevland was entitled to "the opportunity but not the obligation to invest up to equal amounts [as Orlando]. . . at the same terms" in DWAC.  Shevland was therefore entitled to purchase founder shares in DWAC for the same cost per share as Orlando up to the same amount of shares.

28.     From their introduction in December 2020 forward, Orlando relied on Shevland for guidance, support, and expertise to ensure that the launch of DWAC would be a success.  An opportunity arose to enter into negotiations with TMTG, an emerging media and technology company created by former President Donald Trump, as a potential merger target.

29.     When Shevland became aware of the TMTG opportunity, his interest was immediately piqued; he believed that a merger with TMTG would provide the greatest shareholder

value as compared to other potential merger candidates in the pipeline. Drawing on his quantitative research experience, Shevland constructed various financial and valuation models for the company's new social media project. Once that work was completed, Shevland was confident that the TMTG opportunity presented the greatest upside for shareholders.

30.      When Shevland shared his findings with Orlando, he was surprised and disappointed to learn that the plan was to pass on the TMTG opportunity due to opposition from board members who rejected an affiliation with former President Trump for personal reasons. Shevland reminded Orlando that their obligation was to ignore personal beliefs and instead to maximize shareholder value.

31.      Due to Shevland's efforts, a second vote was held whereby TMTG ultimately was chosen as an appropriate SPAC merger candidate and later elected to merge with DWAC.

32.      On or about June 10, 2021, Shevland and Orlando communicated extensively concerning DWAC. Orlando stated that the DWAC IPO paperwork was originally filed with SEC for $100 million but would eventually be re-filed at $305 million to reflect a bigger SPAC and larger capital pool. Orlando picked $305 million due to the area code of Miami to mimic the rap star Pitbull, whose moniker was Mr. 305, the King of Miami. Orlando told Shevland that he (Shevland) would become a director of DWAC and receive 7,500 shares for serving as director. He further asked Shevland to raise $5 million in capital for DWAC, promising Shevland that he would get a "WHOLE LOTTA SHARES" in exchange for his involvement in DWAC. A true copy of the WhatsApp conversation from June 10, 2021 is attached hereto as Exhibit I.

33.      Thereafter, Orlando sent the requisite FINRA forms and other questionnaires to Shevland for his appointment as a director of DWAC, which Shevland completed with Orlando's

input.  A true copy of the WhatsApp conversation between Orlando and Shevland discussing the DWAC director forms is attached hereto as Exhibit J.

34.     Shortly thereafter, DWAC filed an amended S-1 listing Shevland as a nominee to the Board of Directors.  A true copy of relevant pages from DWAC's July 8, 2021 amended S-1 is attached hereto as Exhibit K.  Shevland's likeness, credentials, and experience were also included in investor materials designed to encourage investment in DWAC.  A true copy of pages from the DWAC investor materials containing Shevland's likeness is attached hereto as Exhibit L.

**Shevland Seeks to Enforce the SPAC Business Agreement**

35.     Since the SPAC Business Agreement gave Shevland the right to invest up to equal amounts as Orlando at the same price per share, Shevland repeatedly asked Orlando the share price he was buying into DWAC at.  At one point, Shevland expressed his frustration with Orlando:

> I am happy to go to all of the relationships I've built over the course of 20 years for you.  I can raise you this money. I sincerely request that you consider the possibility that you are simply trying to make too much money for yourself.  It is going to take it [sic] entire team to make these SPACs successful, it is not just about how many shares you own. Please trust me.

A true copy of the WhatsApp message from Shevland to Orlando on June 12, 2021 is attached hereto as Exhibit M.

36.     Orlando flatly refused to give this basic information to Shevland.  At one point, Orlando wrote to Shevland: "When you buy Tesla or Microsoft stock you don't care what [Elon] Musk or [Bill] Gates paid!"  A true copy of the WhatsApp message from Orlando to Shevland on June 13, 2021 is attached hereto as Exhibit N.

37.     Later in the same exchange, Orlando and Shevland continued to go back and forth about the deal Orlando was getting on DWAC shares:

> Orlando: You are still too focused on my economics… Pretend like the shares cost me $3.

11

Shevland: [B]ut they don't, we aren't protecting your cost, we are protecting your ability to earn $500 million.  That is the reality.

Orlando: Your [sic] still focused on what I make.  Focus on what the guy that buys at $5 can make . . .  Focus on that you can make $75mm under the scenario we kicked around [.]

Shevland: Do I have an opportunity to buy shares at $2 personally?  Obviously not unlimited but $500k at least?

Orlando: No.  How is that fair if my dad paid $4?  And I've put in thousands of hours of work?  The way for you to get $2 per share is raise from others- lowers you [sic] share price.

A true copy of the WhatsApp conversation between Orlando and Shevland on June 13, 2021 is attached hereto as Exhibit O.   Simply put, due to his own greed, Orlando refused to tell Shevland the cost he was paying per share for his own investment so that Shevland could not demand equal terms as required under the SPAC Business Agreement.

38.     While side-stepping his obligations to disclose his share price and totals to Shevland, Orlando continued to look to Shevland to raise investor money for DWAC, work on investor presentations, and implement systems and procedures to ensure the proper flow of information among prospective and actual investors and DWAC personnel.  In addition, Shevland identified and fixed multiple errors he found in DWAC investor documents and presentations, which, if left unfixed, would have damaged the credibility of the SPAC effort.

39.     On June 17, 2021, Shevland took steps to minimize the potential effects of Orlando's not honoring their Agreement.  Specifically, Shevland sent Orlando an email clarifying that he still expected his personal investment to be at the same share price as Orlando's, but asking that Orlando at least commit to an average price of $3 per share for the $5,000,000 capital stack, which would include Shevland's personal investment.

> We will work to put together a full $5,000,000 'book' for your benefit and this book will average $3 per share or more.  I personally plan to be part of that capital stack with a personal investment at terms that **I hope will be on par with you as previously agreed**, but regardless, the aggregate of all capital raised including my investment, will average no less than $3.  If the aggregate is better than $3, we share in the difference 50/50 but we may elect to reinvest our portion to purchase additional shares at $3. . .  You cannot return my personal investment or change any of the terms that we agree to once I begin work.

A true copy of Shevland's email to Orlando on June 17, 2021 is attached hereto as Exhibit P (emphasis added).

40.    In short, due to Orlando's failure to disclose his DWAC economics, Shevland sought to preserve his right to participate in the SPAC at some level.  As previously noted, Orlando had stated that Shevland should "pretend" the shares cost Orlando $3 and that Orlando's own father was paying $4 per share.  These were the only economic terms he ever provided Shevland. Thus, even though he suspected Orlando would be getting more favorable terms, Shevland took Orlando at his word.  Had Shevland known that through transactions that Orlando kept hidden from him, Orlando's actual share price was much closer to $0 per share, Shevland would never have suggested a $3 share price.

41.    In response, Orlando pounced on Shevland's lack of information and confirmed: "**ALL APPROVED**."  A true copy of Orlando's reply email on June 17, 2021 is attached hereto as Exhibit Q.  Notably, Orlando did not clarify whether he had "approved" Shevland investing at terms "on par" with his own or Shevland's $3 average share price proposal, but this response reassured Shevland that he would not miss out on the opportunity to purchase founder shares in DWAC and, at a minimum, participate on terms that he believed were in line with Orlando's—as required under the SPAC Business Agreement.

42.     Shevland leveraged his business network and considerable experience to ensure that DWAC would be a success.  Through significant effort that required him to drop other work projects, Shevland brought in a total of $2,330,000 in investments, distributing a total of 582,500 shares.  At the same time, Shevland was admonishing Orlando that they needed to focus on execution to ensure success:

> You have done a great job shaking the trees and finding some really interesting projects, I will never take that away from you.  You are very talented.  It could all be wasted if we don't start focusing on making these projects successful. There is so much work ahead of us and it isn't the type of work we can hire and delegate.

> You are the CEO of 3 SPACs, director of 1 more, the issue keeping you from significant wealth will not be how fast you raise your 5th SPAC.  It is time for us to execute.  We need to get in the weeds on potential targets, due diligence, game plan, merger priorities, integration team, etc.

A true copy of the WhatsApp conversation between Shevland and Orlando on June 28, 2021 is attached hereto as Exhibit R.

43.     Shevland also kept pushing Orlando on his economics, stating:

> I've been working on this for you like it was the only project in the world, hearing that 'the share price is too low' as the primary issue after what I have been uncovering and the issues we have to solve is disappointing. This is not the best we can do.

Orlando, in response, acknowledged Shevland's efforts in support of DWAC: "You have been awesome.  The best.  Love you for all the effort and excited for what we have in store."  See Exhibit R.

44.     On August 4 and again on August 5, 2021, Shevland advised Orlando that he still needed to make his personal investment in DWAC.  Because Orlando told Shevland that he should assume Orlando himself was paying $3 per share, Shevland took steps to mitigate his damages and

proposed terms on which to make his personal investment assuming an average $3 per share for the capital stack:

> It sounds like we are rapidly approaching the IPO so it is time for me to close out my pre IPO work and make my personal investment in sponsor shares. I am happy to discuss with you what amount you would like me to invest. Based on the calculation to arrive at a $3 share price for the capital stack that I introduced, the calculation at various investment levels would be as follows:
>
> > $50,000 – 206,022 shares
> > $100,000 – 276,689 shares
> > $250,000 – 326,689 shares
> > $500,000 – 410,022 shares
>
> **Per our agreement, I am prepared to invest up to an equal amount as you and at the same terms. Without waiving that option, I am also willing to invest in this one instance pursuant to the chart above.**
>
> Once we get through the IPO, I plan to continue to add a tremendous amount of value and utilize my team to identify the ideal merger candidate and work towards a successful merger. My goal is to demonstrate such a significant amount of value that we can follow our agreement which gives us the right but not the obligation to invest up to equal amounts and equal terms into all SPAC projects after BENE. Let's keep discussing ways that we can both work together so that our relationship is mutually beneficial and that these projects are extremely successful for our investors. (emphasis added)

Orlando, continuing to string Shevland along, responded that he was "[t]aking a look in just a bit. I have to model it up unless you have it handy." A true copy of the email exchange between Shevland and Orlando on August 5, 2021 is attached hereto as Exhibit S. Orlando never substantively responded to this email, and in fact would have no further communication with Shevland until August 16, 2021.

45.    On August 8, 2021, Shevland sent Orlando yet another email expressing his readiness to wire funds for his personal investment. A true copy of Shevland's email to Orlando on August 8, 2021 is attached hereto as Exhibit T. Orlando did not respond to or acknowledge this email.

**Orlando Continues His Scheme to Freeze Out Shevland and Not Honor Their Agreement**

46.      The next day, August 9, 2021, Shevland received what purported to be a mass email notice to all potential DWAC investors advising that DWAC was fully funded and now closed to additional pre-IPO investments.

47.      Astonished, Shevland immediately emailed Orlando to confirm that the notice allegedly closing the DWAC investment period didn't apply to Shevland, who was prepared to wire in his investment amount "along the lines of our agreement, our communications last week, and the spreadsheet I sent you."  A true copy of the August 9, 2021 email regarding DWAC and Shevland's response to it is attached hereto as Exhibit U.

48.      Orlando's assistant, Natalie Salume ("Salume") responded to this email and indicated that Orlando was unavailable.  A true copy of Salume's email on August 9, 2021 is attached hereto as Exhibit V.  Notably, Orlando had routinely communicated with Shevland at all times of day and night up until this point.

49.      On August 10, 2021, Alex Monje ("Monje"), general counsel for Orlando's investment advisory firm, emailed Shevland to inform him that Shevland was entitled to a share grant based on his role in raising capital for DWAC, but that no further personal investment would be accommodated, as "we are overfunded and cannot accept any additional investments." A true copy of Monje's August 10, 2021 email is attached hereto as Exhibit W.

50.      On August 11, 2021, another Orlando employee circulated a spreadsheet indicating that Shevland's "share grant" for the work that he completed would be 107,292 shares.  A true copy of the August 11, 2021 email with attached spreadsheet is attached hereto as Exhibit X.

51.     On August 12, 2021, Shevland responded to Orlando and his employees rejecting the notion that he was only entitled to 107,292 shares and insisting that Orlando honor the SPAC Business Agreement:

> Patrick,
>
> As you know, our agreement provides us the ability to invest up to equal amounts and equal economics in all SPAC opportunities after BENE. Despite multiple requests, you have not provided me with the information required to calculate my proper share amount and cost. I tried to accommodate you and created a template for DWAC to which you agreed (again) where I could get involved and demonstrate how hard I can work to make this a success. I did the work, and you told me repeatedly what a great job I was doing for you.

A true copy of Shevland's August 12, 2021 email with attachment is attached hereto as Exhibit Y.

52.     On August 13, 2021, having heard nothing from Orlando in response to his entreaties, Shevland reached out to Orlando via WhatsApp and sent him the following message:

> Let me know if you have time to discuss this situation and how to resolve it. I have been anxiously awaiting building something great with you, well beyond just a few SPACs, but I don't know how to keep pouring myself into projects when our agreements are never followed. I know deep down you are a good guy and have been burned before like me so I have to think there is something I am missing or simply not taking into consideration. I want to be fair and reasonable so let's connect and please explain to me why this keeps happening.

A true copy of the WhatsApp message from Shevland to Orlando on August 13, 2021 is attached hereto as Exhibit Z. Orlando acknowledged this message and indicated that he would discuss with Shevland, but Orlando never did so.

53.     On August 16, 2021, Orlando finally responded to the email chain Shevland had begun regarding his personal investment on August 9. Orlando's greed kicked in again. With no reference to the SPAC Business Agreement or the core "equal terms in future SPACs" promise, Orlando dismissively wrote, "I also reviewed this email chain and our other communications, and

I don't see any confusion . . ."  A true copy of the email from Orlando to Shevland on August 16, 2021 is attached hereto as Exhibit AA.

54.    Shortly thereafter, without warning or any further discussion with Shevland, DWAC filed an amended S-1 with Shevland's name removed from the Board of Directors.  A true copy of relevant pages from DWAC's August 20, 2021 amended S-1 is attached hereto as Exhibit BB.

55.    The amended DWAC filing of August 20, filed by Orlando, also included the fraudulent claim that "[o]n August 18, 2021, 7,500 founder shares were returned to our sponsor from a former director nominee."  See Exhibit BB.  As Orlando is well aware, Shevland never "returned" his director shares to DWAC, and in fact was never informed of his removal as a director nominee.  This final, brazen act of fraud cemented the freeze-out of Shevland from DWAC.

**Orlando Profits at Shevland's Expense**

56.    DWAC is sponsored by defendant ARC.  According to SEC filings, ARC held a total of 6,712,500 shares in DWAC as of September 2, 2021.  A true copy of ARC's SEC Form 3, "Initial Statement of Beneficial Ownership of Securities," is attached hereto as Exhibit CC. According to ARC's SEC filings, "Patrick Orlando... is the managing member of the Sponsor and has voting and investment discretion with respect to the securities held by the Sponsor.  As such, Mr. Orlando may be deemed to have beneficial ownership of the shares of Class B common stock held directly by the Sponsor."

57.    According to DWAC's SEC Form S-1, filed prior to its IPO, Orlando's original sponsor investment in DWAC was $25,000.  A true copy of DWAC's final S-1 form, dated September 1, 2021, is attached hereto as Exhibit DD.

58.     On September 3, 2021, DWAC completed its IPO, trading on NASDAQ with an initial price of $10 per share.

59.     ARC later amended its initial reported holdings in DWAC from 6,712,500 founder shares to 7,140,000—a suddenly discovered excess of 427,500 shares.  A true copy of ARC's amended Form 3, dates September 8, 2021, is attached hereto as Exhibit EE.

60.     Following the IPO, ARC transferred a total of 1,650,000 founder shares to a select group of anchor investors, and purchased an additional 1,133,484 shares of Class A common stock at the IPO price of $10 per share.  A true copy of ARC's September 8, 2021 SEC Form 4, "Statement of Changes in Beneficial Ownership," is attached hereto as Exhibit FF.  Following this, ARC owned—and continues to own—a total of 6,623,484 shares in DWAC, 5,490,000 of which are "founder shares".  A true copy of DWAC's September 8, 2021 SEC Schedule 13D reflecting ARC's total ownership is attached hereto as Exhibit GG.  ARC purchased its "founder shares" at a price of $0.003 per share.  See Exhibit DD at p. 15.

61.     The current value of the total shares held by ARC, based on DWAC's stock price, is nearly $350 million.

62.     To date, Shevland has not received any of the following: (a) the 7,500 shares he was allotted as a director of DWAC; (b) the 107,292 shares Orlando offered; (c) the 1,147,735 shares at a cost of $2.33 per share to close out the guaranteed $5,000,000 capital stack; or (d) the opportunity to purchase pre-IPO shares at equal terms to those enjoyed by Orlando, the very core of the SPAC Business Agreement.

63.     Orlando continues to launch new SPACs and, to date, has not fulfilled his agreement to offer Shevland "the opportunity but not the obligation to invest up to equal amounts in all current and future SPAC opportunities, whether internal or external, at the same terms (same

price/share)." Specifically, Orlando's business website currently lists two new SPACs, nicknamed "Big 4" and "Big 5," in which Shevland has been offered no opportunity to invest.

64.    Thus, while Orlando now personally owns nearly $350 million worth of stock following his $25,000 initial investment, through breaches of the Agreement and manipulation of the stock offering his business partner Shevland owns none.

## CAUSES OF ACTION

### COUNT I
**(Breach of Contract against Orlando)**

65.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully restated herein.

66.    As detailed above, Shevland and Orlando entered into a valid contract.

67.    Shevland fully performed pursuant to his agreement with Orlando.

68.    Orlando breached the Agreement by, among other things: (i) failing to either convey 250,000 shares in BENE or return up to $200,000 in capital to Shevland; (ii) failing to disclose his economics with respect to the purchase of DWAC shares with Shevland; and (iii) failing to permit Shevland to share equally in the DWAC opportunity.

69.    As a direct and proximate result of the foregoing breaches of the agreement, Shevland has suffered damages in an amount to be proven at trial.

### COUNT II
**(Breach of the Implied Covenant of Good Faith and Fair Dealing against Orlando)**

70.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully restated herein.

71.    As detailed above, Shevland and Orlando are parties to a written contract.

72.     This contract was subject to an implied covenant that all parties would act in good faith and with reasonable efforts to perform their contractual duties—both explicit and fairly implied—and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contract.  This included the covenant that Orlando would act fairly and in good faith in carrying out his contractual obligations to Shevland.

73.     Shevland met his contractual obligations.

74.     Orlando's breached the implied covenant of good faith and fair dealing by, among other things, failing to disclose his economics with respect to the purchase of DWAC shares with Shevland, and failing to permit Shevland to share equally in the DWAC opportunity.

75.     Orlando's failure to act in good faith has denied Shevland the full benefit of his bargain.

76.     As a direct and proximate result of Orlando's breaches, Shevland has suffered damages in an amount to be proven at trial.

## COUNT III
### (Unjust Enrichment against Orlando and ARC)

77.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully restated herein.

78.     This is an alternative count for unjust enrichment if for any reason an enforceable express contract is not found to have been established between Shevland and Orlando.  Regardless of the legal sufficiency of any alternative express contract claims in this Complaint, Shevland conferred a benefit upon Orlando and ARC, who has knowledge of that benefit.

79.     Orlando and ARC accepted and retained the conferred benefit.

80.     Under the circumstances, it would be inequitable for Orlando and ARC to retain the benefit without paying for it.

## COUNT IV
### (Declaratory Judgment against Orlando and ARC)

81.     Plaintiff repeats and realleges the allegations in Paragraphs 1 through 64 above as if fully restated herein.

82.     An actual controversy exists among Shevland, Orlando, and ARC regarding the enforceability of the SPAC Business Agreement, as well as the parties' respective rights and obligations thereunder.

83.     This Court has the power to grant declaratory relief pursuant to 28 U.S.C. § 2201, which provides that in any case of "actual controversy within its jurisdiction," this Court "may declare the rights and other legal relations of any interested parties seeking such declaration."

84.     The SPAC Business Agreement provided that the parties would "have the opportunity but not the obligation to invest up to equal amounts in all current and future SPAC opportunities, whether internal or external, at the same terms (same price/share)."

85.     Through his words and actions, Orlando has refused to abide by the SPAC Business Agreement, has neither conveyed 250,000 shares in BENE nor returned capital to Shevland; has not provided Shevland with an opportunity to invest in DWAC "at the same terms"; and has not disclosed the terms at which he has invested in DWAC.

86.     Orlando has likewise failed to offer Shevland the opportunity to invest in other future SPACs, including but not limited to the SPACs nicknamed "Big 4" and "Big 5," and has similarly failed to disclose the terms in which he invested in other SPACs.

87.     Accordingly, Shevland seeks a declaration that: (i) Orlando is obligated to either convey 250,000 shares in BENE to Shevland or return up to $200,000 of capital to Shevland; (ii) the SPAC Business Agreement affords Shevland the right to purchase up to as many shares as Orlando at the same share price as Orlando in DWAC, as well as in any and all future SPACs

22

sponsored by Orlando, including, without limitation, the SPACs known as "Big 4" and "Big 5"; (iii) Orlando and ARC are obligated to provide Shevland with the opportunity to purchase up to as many shares as Orlando at the same share price as Orlando in DWAC as well as in any and all future SPACs sponsored by Orlando, including, without limitation, the SPACs known as "Big 4" and "Big 5"; and (iv) Orlando is obligated to disclose the terms at which he purchased shares in DWAC, as well as disclose the terms of Orlando's investments in any and all SPACs sponsored by Orlando after January 2021, including, without limitation, the SPACs known as "Big 4" and "Big 5."

88.    A judicial declaration is necessary and appropriate at this time under all of the circumstances so that Shevland may determine his rights and duties under the SPAC Business Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Shevland respectfully requests that the Court:

A.    Enter judgment in favor of Shevland and against Orlando as to Counts I - III;

89.    With respect to Count IV, enter a declaration that (i) Orlando is obligated to either convey 250,000 shares in BENE to Shevland or return up to $200,000 of capital to Shevland; (ii) the SPAC Business Agreement affords Shevland the right to purchase up to as many shares as Orlando at the same share price as Orlando in DWAC, as well as in any and all future SPACs sponsored by Orlando, including, without limitation, the SPACs known as "Big 4" and "Big 5"; (iii) Orlando and ARC are obligated to provide Shevland with the opportunity to purchase up to as many shares as Orlando at the same share price as Orlando in DWAC as well as in any and all future SPACs sponsored by Orlando, including, without limitation, the SPACs known as "Big 4" and "Big 5"; and (iv) Orlando is obligated to disclose the terms at which he purchased shares in

DWAC, as well as disclose the terms of Orlando's investments in any and all SPACs sponsored by Orlando after January 2021, including, without limitation, the SPACs known as "Big 4" and "Big 5."

B.     Order specific performance of the SPAC Business Agreement, i.e., that Orlando and ARC make available the same number of DWAC shares for purchase by Shevland at a price of $0.003 per share, as were purchased by Orlando;

C.     In the alternative, order damages in an amount to be determined at trial;

D.     Award prejudgment interest and costs, and;

E.     Award such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable under the law.

BRIAN SHEVLAND

By his Attorneys,

*/s/ Martin B. Goldberg*
Martin B. Goldberg, Florida Bar No. 0827029
Jonathan E. Feuer, Florida Bar No. 68752
Lash & Goldberg LLP
Miami Tower
100 SE 2nd Street, Suite 1200
Miami, Florida 33131
(305) 347-4040
mgoldberg@lashgoldberg.com
jfeuer@lashgoldberg.com

William C. Nystrom (*pro hac vice to be filed*)
Raquel Frisardi (*pro hac vice to be filed*)
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210
(617) 778-9100
wnystrom@nbparis.com
rfrisardi@nbparis.com

Dated:  December 14, 2021