UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-24324-CIV-GAYLES

BRIAN SHEVLAND,

    Plaintiff,

v.

PATRICK ORLANDO and
ARC GLOBAL INVESTMENTS II, LLC,

    Defendants.

_____/

**DEFENDANTS' JOINT REPLY IN SUPPORT OF THEIR**
**JOINT MOTION TO COMPEL ARBITRATION AND STAY CASE**

I. **INTRODUCTION**

Like his Complaint, Shevland's Response (ECF No. 21) is chock full of half-truths, misrepresentations, and unfounded mudslinging designed to garner media headlines.[1] His Response does not refute that this case involves two FINRA associated persons (Plaintiff Shevland and Defendant Orlando) and arises from Shevland's solicitation and sale of limited liability company interests (i.e., securities) to third-party investors and alleged compensation relating those activities. As explained below, FINRA Rule 3280 and other law makes this inescapable. There is no such thing as Shevland's entering into the alleged securities-related Agreement at issue in his "individual capacity." As the CEO of a broker-dealer, Shevland knows (or should know) this. Further, ARC remains a "customer" of Shevland as FINRA defines that term, including when the allegations of Shevland's Complaint are accepted as true as they must for purposes of the Motion. ARC's customer status entitles ARC to join the Motion to compel Shevland's alleged claims to arbitration.[2]

---

[1] The irony of his gambit is that by defaming Orlando in court filings and slinging around the word "fraud," Shevland is actually harming the investors he brought to ARC to whom he owes a fiduciary duty.

[2] In an effort to distract the Court from the straightforward Motion, Shevland submitted a declaration replete with legal conclusions masquerading as alleged "facts." Orlando objects to such legal conclusions because they are improper, irrelevant, and inadmissible. *See, e.g.*, ECF No. 21-1, ¶¶ 5-12, 17-18; *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999) ("[S]tatements [that], although presented in the form of factual declarations, are in substance legal conclusions that do not trigger a duty for Plaintiffs to respond with evidence of their own supporting jurisdiction"); *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial."); *Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 911 (11th Cir. 2013) ("The magistrate also did not abuse his discretion in striking the portion of the EEOC cause determination that provided that Hetherington was a qualifying legal individual with a disability because this was a legal conclusion."). Moreover, Shevland's assertions, which are factual in nature, are unavailing in any event because they are irrelevant or immaterial to the discrete legal issues presented by the Motion or contradicted by his

## II. ARGUMENT

As the Eleventh Circuit instructs, "[b]ecause the FINRA Arbitration Code is unambiguous, the parties' intent must be gleaned from the four corners of the document. . . . [T]he language of the Code itself is the best evidence of the parties' intent, and its plain meaning controls. . . . And unlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Raymond James Fin. Servs., Inc. v. Armijos*, No. 19-CIV-81692-RAR, 2020 WL 2026316, at *4 (S.D. Fla. Apr. 27, 2020) (quotation marks omitted) (quoting Eleventh Circuit decisions *Pictet* and *King*).

### A. Shevland does not refute that Orlando was indisputably an "Associated Person" as expressly defined by FINRA.

Despite acknowledging (as he must) that "FINRA Rule 13100(u) does provide that 'a person formerly associated with a member is a person associated with a member,'" Resp. at 7, Shevland obstinately asserts that Orlando should not be deemed to be an associated person. However, Shevland does not dispute that Orlando was an associated person of a FINRA member, Stillpoint, up to May 2019. *Id.* at 6. Nor does he dispute that Stillpoint was a FINRA member. *Id.* Thus, there is no dispute that Orlando is "a person formerly associated with a member," and therefore "is a person associated with a member." Under the express and plain terms of the FINRA Arbitration Code,[3] that means Orlando is an associated person. That's enough. *E.g.*, *Armijos*, 2020 WL 2026316, at *7 ("[T]he relevant question at this juncture is whether a person

---

Complaint's allegations and exhibits. Also, some of those assertions are just plain false. As a non-exhaustive example, Shevland's claim that Orlando received a total of 5,490,000 shares in DWAC at a share price of $0.0003 per share, Resp. 2, is just false, and as a professional in the securities industry Shevland knows (or should know) it.

[3]   "The term 'associated person' or 'associated person of a member' means a person associated with a member, as that term is defined in paragraph (u)." FINRA Rule 13100(b). "For purposes of the Code, a person formerly associated with a member is a person associated with a member." FINRA Rule 13100(u).

2

formerly associated with a FINRA member can still be deemed an 'associated person' for purposes of triggering arbitration under Rule 12200. The Court answers this question in the affirmative, and the plain language of the FINRA Code, once again, favors Defendants' interpretation.").

Attempting to turn the plain and controlling language of the definition on its head and circumvent the on-point holding in *Armijos*, Shevland cites the inapposite decision *Metropolitan Life Insurance Co. v. Puzzo*, No. 1:13-CV-3858-TWT, 2014 WL 1817636 (N.D. Ga. May 6, 2014). Shevland cites *Metro Life* as purported support for judicially engrafting limitations on the definition of associated person beyond being or having been associated with a FINRA member. But this Court recently rejected such arguments. *See Armijos*, 2020 WL 2026316, at *6 (holding that *Wheat First*, which was cited by *Metro Life*, "does not stand for the proposition that there is a temporal bar that requires a transaction to take place *during* the broker's registration period for the broker to be considered an 'associated person'") (emphasis in original). Moreover, the *Metro Life* court was not interpreting the definition of "Associated Person," but instead it was reviewing the definition of a "Member" (i.e., a broker dealer firm with membership to FINRA). *Metro Life*, 2014 WL 1817636, at **2-3. Shevland, the CEO of a FINRA member, knows the difference between a Member and an Associated Person, rendering his citation to *Metro Life* inexplicable.[4]

Shevland also does not rebut that Orlando has been an associated person of Entoro Securities since May 2021. Further, Shevland does not dispute that the alleged breach occurred

---

[4] Nevertheless, *Metro Life* provides some insight for a different reason Shevland overlooks. *Metro Life* actually supports compelling arbitration in this case because it makes clear that the time an alleged agreement is entered into is not the focus. Rather, the court in *Metro Life* looked more broadly at when the "material events giving rise to the dispute" occurred. *See id.* at

3

well after Orlando was an associated person of Entoro Securities. Specifically, Shevland identifies August 18, 2021, and September 3, 2021, as critical dates when he asserts the alleged Agreement was breached by failing to issue him shares he claims he is entitled to. *See* Resp. at 5-6. And even under *Metro Life* that's enough, too. *See footnote 4, supra.* As for Shevland, he has been a FINRA associated person at all relevant times and should not be surprised that another associated person might enforce his FINRA obligations to arbitrate. Therefore, both Shevland and Orlando were associated persons as expressly defined by FINRA, including, but not limited to, when "the material events giving rise to the dispute" occurred.[5]

In sum, whether looking to the plain definition of "associated person" or considering Shevland's inapposite authority, Orlando plainly qualifies as an "associated person."

**B.  Securities laws, FINRA Rules, and the exhibits to the Complaint will not recognize Shevland's business activities as arising only in his "individual capacity"—they are inextricably intertwined with his FINRA registration and his broker-dealer MCG.**

Shevland next attempts to shirk his FINRA arbitration obligations by contending his and Orlando's "respective broker-dealers were not parties to the Agreement, are not third-party beneficiaries to the Agreement, did not perform any services pursuant to the Agreement, and simply put, had no involvement with, or relation to, the Agreement." Resp. at 3. This statement shows that Shevland—a CEO and founder of a FINRA broker-dealer—either fundamentally misunderstands securities laws and FINRA rules or the duty of candor before this Court.

---

*2. Here, Shevland alleges that Orlando responded "ALL APPROVED" to Shevland's June 17, 2021 email in which Shevland claims he "asked that Orlando at least commit to an average price of $3 per share." Resp. 5.  It is undisputed that Orlando was a person associated with FINRA member Entoro Securities on June 17, 2021 and, therefore, this is a separate and independent reason that Orlando qualifies as an associated person under the FINRA Rules.

[5]   Shevland's speculation regarding why Orlando did not list his employment with Entoro in S-1 filings is a red herring. Apart from being irrelevant to FINRA's definition of "associated person," such information was not material to his work as a CEO.

First, as raised in the Motion but ignored by the Response, abundant case law provides that Shevland's activities in selling limited liability interests for ARC in exchange for any compensation—indirect or direct—necessarily arises "in connection with the activities of an associated person of the member." FINRA Rule 12200; FINRA Rule13200. Indeed, Shevland's ability to sell securities lawfully and obtain compensation for raising funds from investors for the purchase of shares in the entities at issue in the complaint is directly hinged to his association with the FINRA member. Shevland could not lawfully raise money from investors through the sale of securities to third-party investors—as he alleges he did—without being a registered representative. *See* 15 U.S.C. § 78o(a)(1). In doing so, Shevland necessarily acted as a broker. *SEC v. Lottonet Op. Corp.*, No. 17-21033-CIV, 2017 WL 6949289 (S.D. Fla. Mar. 31, 2017) (finding individual defendant violated statute by acting as an unregistered broker where "he was engaged in the business of effecting transactions in securities for the accounts of others . . . by personally soliciting the vast majority of the funds from investors . . ." and "received transaction-based commissions" in exchange for selling the securities).

Additional decisions undercut Shevland's argument that he can avoid FINRA's arbitration requirement because he now claims he acted in his "individual capacity."  For example, in *SEC v. Imperiali, Inc.*, No. 12-80021-CIV, 2013 WL 12080193, at *5 (S.D. Fla. Sept. 25, 2013), the court entered summary judgment for violation of 15 U.S.C. § 78o(a)(1) where the broker "personally solicited investors," "served as the 'closer' for the sales staff he hired, speaking directly with their sales leads to negotiate the stock price and complete the sale," and "[a]lthough [he] did not directly receive transaction-based compensation, he received the majority of the proceeds from the stock sales." *See also SEC v. Walker*, No. 20-62564-CIV-SINGHAL, 2021 WL 5088854, at *2 (S.D. Fla. Aug. 16, 2021) ("[T]he SEC alleges Walker acted as a broker or

dealer in selling 1 Global's securities without being registered as or associated with a broker or dealer.").

Second, Shevland's claims that he received no compensation are belied by the alleged Agreement and FINRA's broad view of compensation. Exhibits F, G, and H to the Complaint highlight that Shevland's compensation was tied to raising investor funds:

> In the event that Brian and his network are able to raise more sponsor capital in order to reduce the price per share, both Brian and Patrick will share equally in the price/share reduction, the shares will not be bifurcated.

Compl., Ex. F-H (point 4 in Feb 10, 2021 8:34 PM email from Shevland); *see also* Compl., Ex. O (Orlando to Shevland: "The way to get $2 for you is raise from others- lowers you share price.... Sell you at $2, everything over $10 is 50/50"). Indeed, Shevland's own exhibits confirm that this was a business partnership between FINRA associated persons, not a mere "personal investment . . . through the SPAC Business Agreement" as Shevland is trying to make it appear.

Third, Shevland argues that he "communicated about the SPAC Business Agreement exclusively through non-MCG channels." Resp. at 6. But, as Shevland knows (or should know as the CEO of a FINRA Member), FINRA Rule 3280(b) mandates that "[p]rior to participating in *any private securities transaction*, an associated person shall provide written notice to the member with which he is associated describing in detail the proposed transaction and the person's proposed role therein and stating whether he has received or may receive selling compensation in connection with the transaction . . . ." FINRA Rule 3280(b) (emphasis added). And if, as here, the private securities transaction would provide the registered representative any selling compensation, and the FINRA member approves the transaction then "the transaction shall be recorded on the books and records of the member and the member shall supervise the person's participation in the transaction as if the transaction were executed on behalf of the

member." FINRA Rule 3280(c)(2). If the FINRA member does not approve the transaction, FINRA Rule 3280(c)(3) mandates that the person shall not participate in the transaction *in any manner*, directly or indirectly." *Id.* (emphasis added).

Consequently, either Shevland sought and obtained approval to conduct the transactions at issue from MCG and is misleading the Court in his Response or he was "selling away"[6] from MCG which is another violation of FINRA Rules. *See, e.g.,* FINRA Rule 3280(b). Either way, the fact that he "communicated through non-MCG channels" does not spare him from arbitration.

Fourth, Shevland goes a step further and claims his exhibits "contain no reference to MCG." Resp. at 6. That is false. MCG is a prominent feature of Exhibit E, a critical document:

> This document outlines potential business efforts. I think all below goes hand in hand and should be executed together.
>
> 1. Launch of Investment Banking Activity:
>
> a. Option 1: Patrick and Eric to partner with Brian to launch investment banking desk for/clear through Bluestone CM/**MCG**? Patrick and Eric to be registered reps of Bluestone CM **or MCG**. Group split on revenue with preferred group split to cover desk/house costs. Desk will focus on M&A, SPAC activity non-underwritten, IPO non-underwritten, capital raising activities, Secondaries non-underwritten as well as launching a PE type fund business, and advisory services.
>
> b. Option 2: Patrick to run investment banking efforts for/clear through Bluestone CM/**MCG**. Patrick to be registered rep of Bluestone CM **or MCG** with 80/20 split on revenue with potential agreement to split as a group? Desk to focus on M&A, SPAC activity non- underwritten, IPO non-underwritten, capital raising activities, Secondaries non- underwritten. Eric will also be partner with Brian working on fund business and advisory business which will in turn partner with Patrick's IB desk.

---

[6] "Selling away . . . occurs when a financial advisor is involved in the sale of an investment that is not part of the products offered by the advisor's firm." *Viyella v. Fundacion Nicor*, 19-25094-CIV, 2020 WL 977481, at *5 (S.D. Fla. Feb. 28, 2020), *appeal dismissed sub nom. Viyella v. Fundacion Nicor*, No. 20-11224-BB, 2020 WL 5755844 (11th Cir. July 14, 2020).

7

Compl., Ex. E (emphasis added). Further, Shevland omits that both his "Director Biography" and an Amended Form S-1 he references regarding DWAC also list and detail his MCG employment. Compl., Exs. K & L. Thus, contrary to Shevland's false assertion, several exhibits to his Complaint expressly reference MCG. Shevland simply cannot separate his alleged activities under dispute from his association with FINRA member MCG Securities LLC.

Fifth, another fact Shevland shies away from is that a main term of the alleged Agreement was that Orlando would register with MCG. *See* Compl., Ex. E ("Patrick to be registered rep of Bluestone CM or MCG with 80/20 split on revenue with potential agreement to split as a group?"). Thus, Shevland's assertion that MCG had nothing to do with the alleged agreement is non-sensical and belied by the very documents attached to his Complaint. Removing the other components of the alleged Agreement, there is an agreement by one FINRA associated person (Shevland) to have another FINRA associated person (Orlando) register with Shevland's FINRA Member Firm (MCG). This is the very type of dispute that Shevland could foresee being arbitrated by FINRA as an industry dispute.

Lastly, Shevland's legally required affiliation with a FINRA member for his obligations under the alleged Agreement is what separates this case from the narrow facts the Eleventh Circuit considered in *Pictet* and aligns this case instead with all the other cases Defendants have cited. Shevland's "proposed limitation of the business activities requirement risks blocking claimants from initiating FINRA arbitrations on selling away or negligent supervision claims because those claims necessarily involve activity not explicitly sanctioned by the FINRA member." *Viyella v. Fundacion Nicor*, No. 19-25094-CIV-ALTONAGA, 2020 WL 977481, at *8 (S.D. Fla. Feb. 28, 2020). Just as the Courts in *Viyella*, *King*, *Mony, Axos, Simon,* and *Oppenheimer* decided (see ECF No. 18 at 7-10), this Court too should reject such interpretation.

8

### C. Shevland fails to refute ARC's status as a "customer" under FINRA Rules.

As with his other arguments, Shevland asks this Court to rewrite the FINRA Rules and craft an unduly narrow definition of who qualifies as a "customer." Specifically, Shevland argues that ARC cannot be a customer because ARC "did not: purchase a good or service from MCG or Shevland; have an account with MCG; or have a contractual relationship with MCG or Shevland." Resp. at 11. However, Shevland's own allegations in his Complaint control on this issue, notwithstanding what Shevland asserts in his Response.[7] As shown in the Motion, Shevland's Complaint specifically alleged that he "conferred a benefit upon Orlando and ARC" and that "ARC accepted and retained the conferred benefit." Compl. ¶¶ 78, 79. As Shevland knows and alleged in his Complaint, ARC is DWAC's sponsor and as a sponsor it holds DWAC's founders' shares. Shevland's investors purchased limited liability interests in ARC that correlate to an amount of founders' shares that are distributed after the business combination. This is why Shevland named ARC as a defendant in this lawsuit. For Shevland now to suggest otherwise runs counter to his duty of candor to this Court.

In any event, ARC easily meets the actual, applicable FINRA definition of a "customer." FINRA Rule 12100(k) defines "customer" as "not include[ing] a broker or dealer." As the Eleventh Circuit has held, "nothing in the Code directs otherwise or requires more." *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364, 1364 (11th Cir. 2004). Recent case law reaffirms that Shevland's request to engraft additional elements onto FINRA's Rule defining "customer" must be rejected. In *Viyella*, 2020 WL 977481, this Court distinguished the decisions that Shevland

---

[7] Although Shevland now attempts to run away from the allegations of his Complaint, "[o]n a motion to compel arbitration, the allegations of the complaint are taken as true." *SBMH Grp. DMCC v. Noadiam USA, LLC*, 297 F. Supp. 3d 1321, 1327 n.3 (S.D. Fla. 2017) (compelling arbitration where plaintiffs alleged defendant was a shareholder of a company and agreement at issue "applies to disputes between the company and any shareholder").

9

relies on in footnote 2 of his Response and thoroughly explains why the Eleventh Circuit precedent cited in Orlando's Motion—*King* and *Mony*—control. The *Viyella* court also rejected Shevland's central argument "that *Pictet* limits the definition of a customer." *Id.* at *6. Indeed, in *Viyella v. Fundacion Nicor*, No. 19-25094-CIV-ALTONAGA, 2020 WL 3315904 (S.D. Fla. April 23, 2020), the party resisting arbitration came back for a second-bite at the apple, and the Court reaffirmed its reasoning. In *Armijos*, 2020 WL 2026316, this Court again adopted the same reasoning as *Viyella*. As the *Armijos* court observed, "the absence of a direct customer relationship between [the FINRA Member] and the Defendants is of no moment." *Id.* at *6. The *Armijos* court explained that "the unambiguous language of the Code . . . makes clear that the definition of 'customer' is broad." *Id.* Confronted with the same arguments Shevland makes here, the *Armijos* court explained that in *King* the Eleventh Circuit "found that the plaintiff's interpretation would read 'a limitation into the Code that is absent from its language.'" *Id.* The *Armijos* court also adopted the reasoning of *Viyella*. *Id.* "In sum, there is no requirement that a party directly transact with a FINRA member to qualify as a 'customer' for purposes of Rule 12200." *Id.* ARC, which is neither a broker nor a dealer, therefore qualifies as a FINRA "customer" because "nothing more is required." *King*, 386 F.3d at 1364; *Deutsche Bank Sec., Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4685876, at *2 & n.1 (S.D. Fla. Sept. 26, 2019) (Gayles, J.) (same) (quoting *King*, 386 F.3d at 1364).

### III. CONCLUSION

For the reasons above and in the Motion, the Court should grant the Motion and compel Shevland to submit his claims to arbitration before FINRA, and stay all proceedings in this action, including Rule 12 motions, pending completion of arbitration.

10

Dated: March 7, 2022

                                                  Respectfully submitted:

| SALLAH ASTARITA & COX, LLC |  |
|---|---|
| Counsel for Defendant ARC Global Investments II, LLC<br>3010 North Military Trail, Suite 210<br>Boca Raton, FL 33431<br>Tel.: (561) 989-9080<br>Fax: (561) 989-9020 | Counsel for Defendant Patrick Orlando<br>1200 Four Seasons Tower<br>1441 Brickell Avenue<br>Miami Florida 33131<br>Phone: (305) 350-5116<br>Fax: (305) 372-2738 |
| By: *s/ James D. Sallah*<br>    James D. Sallah, Esq.<br>    Fla. Bar No. 0092584<br>    Email: jds@sallahlaw.com<br>    Joshua A. Katz, Esq.<br>    Fla. Bar No. 0848301<br>    Email: jak@sallahlaw.com | By: *s/ Adam L. Schwartz*<br>    Adam L. Schwartz, Esq.<br>    Email: aschwartz@homerbonner.com<br>    Florida Bar No.: 103163<br>    Gregory J. Trask, Esq.<br>    Email: gtrask@homerbonner.com<br>    Florida Bar No.: 055883<br>    Antonio M. Hernandez, Jr., Esq.<br>    Email: ahernandez@homerbonner.com<br>    Florida Bar No.: 017756 |