## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 21-24324-Civ-GAYLES/TORRES

BRIAN SHEVLAND,

    Plaintiff,

v.

PATRICK ORLANDO and
ARC GLOBAL INVESTMENTS II, LLC

    Defendants.

_____/

## ORDER ON DEFENDANTS' JOINT MOTION
## TO COMPEL ARBITRATION AND STAY THE CASE

This matter is before the Court on Patrick Orlando's ("Orlando"), and ARC Global Investments II, LLC's ("ARC") (collectively "Defendants") joint motion to compel all of Brian Shevland's ("Shevland" or "Plaintiff") claims to arbitration and stay the case pending completion of the arbitral proceedings. [D.E. 18]. Plaintiff filed a response on February 18, 2022, [D.E. 21], to which Defendants replied on March 7, 2022. [D.E. 24]. The motion is ripe for disposition.[1] After careful review of the motion, response, reply, relevant authority, and for the reasons discussed below, Defendants' motion to compel is **GRANTED in part and DENIED in part**.

---

[1] On June 15, 2022, the Honorable Darrin P. Gayles referred the case to the Undersigned for a ruling on all pre-trial, non-dispositive matters, and a report and recommendation on all dispositive matters. Disposition of an arbitration motion may be deemed non-dispositive. But given the hybrid nature of such a motion, the Court will enter an Order on the motion but the parties have leave to appeal, if desired, by seeking de novo review as if the Order was a Report and Recommendation.

1

## I. BACKGROUND

This case arises from a business relationship gone sour. Shevland is a founder and CEO with over twenty years of experience in the financial services industry. [D.E. 1, ¶13]. Orlando is a financial advisor and is the managing member of co-Defendant ARC. Shevland was introduced to Orlando in late 2020 through a friend who told Shevland that Orlando was looking for help in setting up a business dedicated to the formation and execution of Special Purpose Acquisition Companies ("SPACs").[2] *Id.* ¶14. The gist of the enterprise encompassed: creating SPACs from scratch, bringing in investors, identifying potential targets, and effectuating a successful merger. If all went well, Shevland and Orlando would reap the benefits by having their founder shares grow in value exponentially. *Id.* ¶11.

Following multiple discussions, Shevland and Orlando entered into an oral agreement setting forth the terms of their collaboration agreement on or about December 21, 2020. According to the Complaint, the parties agreed to being equal partners in all future SPAC opportunities, meaning that, in exchange for their contributions to the enterprise, both Shevland and Orlando would have the right to invest in founder shares of each SPAC at the same price and to purchase the same number of shares. *Id.* ¶15. Soon thereafter, however, Orlando allegedly breached the oral contract by limiting the number of shares to which Shevland was entitled in

---

[2] "A SPAC is a publicly traded corporation with a two-year life span formed with the sole purpose of effecting a merger, or "combination," with a privately held business to enable it to go public. SPACs raise money largely from public-equity investors and have the potential to derisk and shorten the IPO process for their target companies, often offering them better terms than a traditional IPO would." Max H. Bazerman & Paresh Patel, *SPACs: What You Need to Know*, Harvard Business Review, July-August 2021, https://hbr.org/2021/07/spacs-what-you-need-to-know.

connection with Benessere Capital Acquisition Corporation ("BENE"), their first SPAC opportunity. Despite Shevland's displeasure with their first deal, he was still interested in pursuing this venture with Orlando but insisted in memorializing the agreement in writing. *Id.* ¶¶17-19.

Between January 31 and February 10, 2021, the parties exchanged multiple email communications discussing the terms of their agreement, and on February 10, 2021, the parties executed a final version of the agreement in writing. Among other things, the agreement provides that:

> Patrick and Brian will have the opportunity but not the obligation to invest up to equal amounts in all current and future SPAC opportunities, whether internal or external, at the same terms (same price/share). In the event that Brian and his network are able to raise more sponsor capital in order to reduce the price per share, both Brian and Patrick will share equally in the price/share reduction, the shares will not be bifurcated. This right does not extend to BENE since those terms are outlined in the subscription agreement but would apply to all other SPAC opportunities.

*Id.* ¶21. (emphasis removed).

Following execution of the agreement, Shevland and Orlando worked together to build their next project, Digital World Acquisition Company (DWAC), a SPAC sponsored[3] by Orlando and co-Defendant ARC, and for which Orlando was Chairman and CEO. *Id.* ¶26. According to Plaintiff, Orlando relied on him for guidance, support, and expertise to ensure that the launch of DWAC would be a success; and so it was. In 2021, an opportunity arose for DWAC to merge with the Trump Media

---

[3] "The SPAC process is initiated by the sponsors. They invest risk capital in the form of nonrefundable payments to bankers, lawyers, and accountants to cover operating expenses. If sponsors fail to create a combination within two years, the SPAC must be dissolved and all funds returned to the original investors." *Id.*

3

and Technology Group ("TMTG"), an emerging media company created by Donald Trump. Shevland was instrumental in securing TMTG as well as raising capital for DWAC, thereby ensuring DWAC's success and subsequent enormous growth. Among other things, Orlando asked Shevland to raise $5 million in investment capital for DWAC, and Shevland's likeness, credentials, and experience were included in investor materials designed to attract investment in DWAC. *Id.* ¶¶32-34.

Plaintiff alleges, however, that despite satisfactorily performing under the agreement, in the weeks leading up to DWAC's IPO, Orlando froze him out entirely from DWAC, and refused to let him make any investment in DWAC in breach of their agreement. *Id.* ¶55. According to Plaintiff, after DWAC completed its IPO on September 3, 2021, Orlando held 5,490,000 founder shares in DWAC, the value of which increased to approximately $400 million after the TMTG merger was announced. *Id.* ¶¶60-61; [D.E. 21, pp. 5-6].

Based upon these facts, Shevland commenced this action in federal court on December 14, 2021, alleging breach of contract (Count I) and breach of the implied covenant of good faith and good dealing (Count II) against Orlando. Plaintiff also brought a claim of unjust enrichment (Count III) against both Orlando and ARC in the alternative, and a claim for declaratory judgment (Count IV) against Defendants. Defendants have responded by first moving to dismiss all counts in favor of arbitration and to stay this action pending completion of arbitral proceedings.

## II. *ANALYSIS*

Defendants argue that all of Plaintiff's claims should be dismissed in favor of arbitration. Defendants do not dispute that the SPAC investment agreement with

4

Shevland did not include an arbitration clause; rather, they contend that this dispute is subject to arbitration under the auspices of the Financial Industry Regulatory Authority ("FINRA") because the parties are bound by FINRA's mandatory arbitration provisions. [D.E. 18, p. 4]. Specifically, Defendants allege that Shevland and Orlando are subject to FINRA arbitration (i) by virtue of their current and prior status as "associated persons" of a FINRA-member, and (ii) because this dispute arose in connection with Shevland's "business activity" as a FINRA associated person. As to co-Defendant ARC, Defendants assert that ARC is entitled to arbitration by virtue of ARC's status as a "customer" of a FINRA associated person.

Plaintiff, on the other hand, opposes the motion because the claims against Orlando fall outside the realm of FINRA arbitration as (i) Orlando was neither a FINRA-member nor an associated person at the time the parties executed the investment agreement, and (ii) the claims at issue do not relate to Shevland's business activity because he executed the agreement with Orlando in his individual capacity and not in his capacity as a FINRA associated person. As to co-Defendant ARC, Plaintiff asserts that ARC was never his customer because he and ARC never engaged in any sort of transaction.

We address each of these arguments in turn. In short, we agree with Defendants that the claims against Orlando are subject to FINRA arbitration but disagree with respect to the claims against co-Defendant ARC, who is neither a FINRA-member nor a customer of a FINRA associated person. Accordingly, Defendants' motion to compel is Granted in part only as to Orlando.

### A. *The FINRA Rules*

FINRA is a non-profit corporation registered with the Securities and Exchange Commission that regulates securities firms and investment advisors. FINRA derives its authority and duties from the Securities Exchange Act of 1934, *see* 15 U.S.C. §§ 78a, *et seq.,* and has "the authority to exercise comprehensive oversight over all securities firms that do business with the public." *Pictet Overseas Inc. v. Helvetia Tr.*, 905 F.3d 1183, 1187 (11th Cir. 2018).

FINRA regulations provide that its "[r]ules shall apply to all members and persons associated with a member. Persons associated with a member shall have the same duties and obligations as a member under the Rules." [D.E. 18, p. 4] (citing Rule 0140(a)). Rule 13200 requires arbitration when "the dispute arises out of the *business activities of* a member *or an associated person and is between* or among: members, members and associated persons, or *associated persons.*" *Id.* (emphasis added). In turn, Rule 13100(a) defines an "associated person" as a "[a] natural person who is registered or has applied for registration[,]" a "partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions[,]" or "a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member." *Id.*

In addition, Rule 13000(u) provides that "*a person formerly associated with a member is a person associated with a member.*" *Id.* at 3 (emphasis added). FINRA Rule 12200 also provides that arbitration between a "customer" and a Member or an associated person is mandatory upon request by the customer. *Id.* at 4.

### B. *Legal Standard*

Both the Supreme Court and Eleventh Circuit hold that courts must interpret the FINRA Code "as it would a contract under the applicable state law." *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004) (citing *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "Because the FINRA Arbitration Code is unambiguous, the parties' intent must be gleaned from the four corners of the document." *Pictet*, 905 F.3d at 1188 (quoting *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011) (internal quotations omitted)). "[T]he language of the Code itself is the best evidence of the parties' intent, and its plain meaning controls." *Id.* (internal quotation marks omitted). And "unlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *King*, 386 F.3d at 1367 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (internal quotations omitted)). Further, it is well settled that the FINRA Code constitutes a written agreement to arbitrate and can be enforced as such. *Deutsche Bank Sec. Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4864465, at *3 (S.D. Fla. Aug. 20, 2019), *report and recommendation adopted*, No. 19-20053-CIV, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019) (internal citations omitted).

### C. *Plaintiff's Claims against Orlando Are Arbitrable*

#### (i) *Shevland and Orlando Qualify as Associated Persons*

We first address Defendants' claim that both Shevland and Orlando are associated persons of a FINRA Member and, as such, are subject to the arbitration mandate of Rule 13200. In essence, Defendant's argument is that a plain reading of

7

Rules 13100(a) and 13200 dictate a finding of association because it is uncontested that Shevland has been an associated person of FINRA-member MCG Securities LLC ("MCG") since 2014,[4] and that Orlando was an associated person of FINRA-member Stillpoint Capital, LLC ("Stillpoint") from January 1, 2013, to May 2019, and of FINRA-member Entoro Securities, LLC ("Entoro") since May 2021. Hence, Defendants allege that by virtue of their previous and current status as associated persons, both Shevland and Orlando meet FINRA's definition of associated persons.

Defendants' position is well founded. As even Plaintiff acknowledges, the plain reading of Rule 131000(u) provides that "a person formally associated with a member" is deemed "a person associated with a member" for FINRA purposes. [D.E. 21, p. 7]. As such Shevland and Orlando are by Rule associated persons subject to FINRA's arbitration mandate.

Yet, Plaintiff asserts that Orlando's status as an associated person to the FINRA-members is futile here because he was not associated with either of these firms in February 2021, the date on which the parties executed the investment agreement. This is so, Plaintiff posits, because "there must still be a nexus between the former FINRA membership and the issues at hand in the Complaint," [D.E. 21, p. 7], a dubious proposition that finds no support in the cases cited by Plaintiff. *See MONY*, 390 F.3d at 1343 (observing that the Eleventh Circuit applied "a two-part test" framework to the enforcement of arbitration under NASD, FINRA's predecessor, whereby the court first addresses whether the dispute is between

---

[4] "It is also true that since April 8, 2014, I have been registered with MCG Securities LLC ("MCG"), a broker dealer and member of FINRA." [D.E. 21-1, ¶ 4].

8

members or associated persons (prong one), and then determines whether the dispute has a connection (or nexus) with the activities of the associated person (prong two)). Nothing in the text of FINRA Rule 131000(u) requires a showing of nexus between membership and the claims alleged in the Complaint, and Plaintiff does not cite any legal authority in support of this proposition.

Indeed, this court has previously rejected similar extrapolations of the nexus prong into other parts of the FINRA code. *See Viyella v. Nicor*, No. 19-25094-CIV, 2020 WL 977481, at *6 (S.D. Fla. Feb. 28, 2020), *appeal dismissed sub nom Viyella v. Fundacion Nicor*, No. 20-11224-BB, 2020 WL 5755844 (11th Cir. July 14, 2020) (rejecting the notion that *Pictet*'s nexus requirement applies to the definition of "customer" under FINRA, and holding that "Movants' insistence the Court should follow the FINRA's guidance on the definition of a customer under a different rule fails to persuade.").

Notwithstanding, Plaintiff argues to the contrary by relying on a single case from Georgia for the proposition that a former FINRA member is subject to arbitration only "if its membership was not terminated or cancelled prior to the events giving rise to the dispute." [D.E. 21, p. 8 (citing *Metro. Life Ins. Co. v. Puzzo*, No. 1:13-CV-3858-TWT, 2014 WL 1817636, at *2 (N.D. Ga. May 6, 2014))]. But Plaintiff's reliance in *Puzzo* is misplaced. First the facts in that case were significantly different from those at hand. In *Puzzo*, the Court refused to send a breach of contract case (regarding non-solicitation obligations) to FINRA arbitration on the basis that all of the material events giving rise to the dispute took place several years after the relevant *FINRA-member* had terminated *its FINRA membership*.

9

*See Puzzo*, 2014 WL 1817636 at *2. Hence, that court's focus was on the membership status of the FINRA-member itself, and not on the membership status of an associated person. By contrast, nowhere does Plaintiff allege that the relevant FINRA-members to this dispute have had their FINRA memberships cancelled, terminated, or suspended. As such, *Puzzo* is simply inapposite.

Second, a closer reading of *Puzzo* undermines Plaintiff's position that the relevant time frame in determining FINRA association status is the date on which the contract was executed. In *Puzzo* the court expressly noted that there were numerous "material events giving rise to [the action,]" one of which was the date of execution. *Id.* Yet, the court notably also deemed relevant the date on which the defendant was terminated form his job, as well as the date on which he poached some of his former colleagues. Like *Puzzo*, execution of the investment agreement in our case is only one of the dates material to the dispute. Just as material, or even more material, are the dates in which Orlando allegedly breached the agreement during the months of June, July, August, and September, [D.E. 1, pp. 11-17], when Orlando enjoyed status as a FINRA associated person by virtue of both his prior and current association to FINRA-member entities. *See FINRA Rule* 13000(u) (providing that "a person formerly associated with a member is a person associated with a member.").

Consequently, Plaintiff's argument that he and Orlando were not FINRA associated persons when the material events giving rise to this dispute is unpersuasive. This theory belies the plain meaning of FINRA Rules and misapplies the relevant law. Hence Defendants' motion is entirely sound in this respect.

### *(ii) The Dispute Arose from the Business Activities of Shevland*

Having found that Shevland and Orlando are associated persons under FINRA, we turn to the second argument Plaintiff raises in opposition to Orlando's motion to compel arbitration: that his claims do not relate to his business activity because he executed the agreement with Orlando in his individual capacity and not in his capacity as a FINRA associated person.

We again agree with Defendants on this score because the claims against Orlando are subject to arbitration under Rules 12200 and 13200. The crux of the dispute arises from Shevland's business activities as an associated person of a FINRA member. Specifically, in performing under the agreement, Shevland was, by necessity, required to engage in investment-related activity connected to his status as a FINRA associated person. As such FINRA arbitration is properly triggered.

Plaintiff takes issue with this proposition but cites no authority, and we are unaware of any, supporting the claim that a FINRA associated person is absolved from his FINRA obligations when engaging in investment-related activity in his individual capacity. Instead, Plaintiff primarily relies on the Eleventh Circuit's decision in *Pictet*, where the court enjoined two trust funds from proceeding in arbitration against a Canadian entity and some of its indirect owners. There, the enjoined trusts had hired an independent investment manager and through him opened custodial accounts with Banque Pictet, a Swiss bank. *See Pictet*, 905 F.3d at 1185. After the investment manager stole the money from the accounts, the trusts initiated FINRA arbitration against eight partners and several corporate affiliates of Banque Pictet, one of which was Pictet Overseas, Inc., a Canadian broker-

11

dealer and FINRA member. *See id.* But because Pictet Overseas was not in the business of keeping custodial accounts, was not licensed to engage in such activities, and where the business of custodial accounts was not even FINRA regulated, the court held that a dispute arising from the maintenance of such accounts could not possibly relate to the business activities of a FINRA member. *Id.* at 1190.

It is worth noting that the *Pictet* decisions, both at the district and appeals levels, relied heavily on *Valentine*, a California Court of Appeals' case that warrants closer review. *Valentine Cap. Asset Mgmt., Inc. v. Agahi*, 174 Cal. App. 4th 606, 608, 94 Cal. Rptr. 3d 526, 527 (2009). In *Valentine* the court refused to compel arbitration in a dispute concerning the parties' ownership interest in one of plaintiff's businesses (a non-FINRA business) and the parties' respective right to certain clients of that business. *Id.* Concerned with the effects that an untethered construction of the phrase "arising out of the business activity of an associated person" could have, the court found that commonsense instructed that FINRA requires arbitration of disputes:

> [O]nly if they arise out of the business activities of an individual as an associated person of a FINRA member. With this interpretation, FINRA and the registered representatives under its jurisdiction are assured that arbitration will pertain to matters with some nexus to the activity actually regulated by FINRA. This is nothing else than common sense meaning of the plain language contained in Rule 13200, and any other interpretation would wrongly strip individuals of their civil jury trial rights *concerning subject matter in which FINRA maintain no regulatory interest.*

*Valentine*, 174 Cal. App. 4th at 616. (emphasis added).

According to *Valentine*, this common-sense construction of the scope of FINRA arbitration would safeguard the expectations that associated person also engaged in

side businesses "as freelance photographer[s], coin collector[s], novelist[s], [or] real estate agent[s][,]" would have about not arbitrating before FINRA "these types of non-investment disputes." *Id.* at 615-16; *see also Pictet*, 905 F.3d at 1189 (observing that the business activities of an associated person in his capacity as a real estate agent have nothing to do with his status as a FINRA member); *id.* 1189 n.8 ("Like the district court, we are persuaded by the reasoning in *Valentine*").

Against this backdrop, then, it is hard to see how the concerns underpinning the reasoning of *Valentine* and *Pictet* could possibly apply to Shevland's situation. Here, the dispute does not arise from Shevland's side business on freelance photography or real estate; it arises from Shevland's involvement in an investment venture aimed at forming and launching special investment vehicles. By Shevland's own account, this venture entailed his active involvement in the solicitation of investors, the offering of SPAC securities, and the raising of investment capital for the respective SPACs. [D.E. 1, ¶¶ 32-34]. Clearly, this is the sort of activity in which FINRA maintains a regulatory interest. Furthermore, Shevland's involvement in this venture presupposed a level of involvement that had a connection to his status as a FINRA associated person. That is miles apart from the types of claims at issue in *Valentine* and *Pictet*.

Indeed, contrary to Plaintiff's claim that his involvement in the SPAC investment agreement was entirely divorced from his connection to FINRA member MCG, exhibits attached to the Complaint bolster Defendants' position as they reflect that the parties expressly discussed and contemplated Plaintiff's status as a FINRA associated person. [D.E. 1-8, Ex. E (reading in relevant part: "[Orlando] and Eric to

partner with [Shevland] to launch investment banking desk for/clear through bluestone CM/MCG? [Orlando] and Eric to be registered reps of Bluestone CM or MCG" and "[Orlando] to run investment banking efforts for/clear through Bluestone CM/MCG.")]; *see, e.g., Deutsche Bank Sec., Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4685876, at *2 (S.D. Fla. Sept. 26, 2019) (finding that claims arose from the business activities of associated person where relevant correspondence reflected his association with FINRA member).

In sum, the record here does not support Plaintiff's theory that he executed and performed under this agreement in his individual capacity such that it absolves him from the requirements of FINRA. The overall record reflects that Shevland's involvement in the investment venture concerned a "subject matter in which FINRA maintain[s] [a] regulatory interest," *see Valentine*, 174 Cal. App. 4th at 616, and that his performance of the agreement entailed investment-related activities with a connection to his status as a FINRA associated person, *see Pictet*, F.3d at 1189. Hence, we hold that this dispute arises from Shevland's business activities in connection to his status as a FINRA associated person as defined by the FINRA Rules.

Accordingly, having concluded that both Shevland and Orlando fall within FINRA's definition of "associated persons" and that their dispute arises from Shevland's "business activities" in connection to his status as a FINRA associated person, we find that all of the claims between Shevland and Orlando raised by the Complaint are subject to mandatory arbitration pursuant the FINRA Rules.

### D. *Plaintiff's Claims Against ARC are not Arbitrable*

We turn finally to the question of arbitrability as to co-Defendant ARC. The claim here is not that he was an associated person like Orlando, but instead a "customer" under the FINRA rules. Plaintiff's opposition to arbitration is more persuasive in this respect. We thus reject Defendants' claim that co-Defendant ARC is entitled to FINRA arbitration by virtue of its status as a customer of Shevland.

As noted above, FINRA Rule 12200 provides that arbitration between a customer and a member or an associated person is mandatory upon request by the customer. According to Defendants, FINRA Rules define customer as "not include[ing] a broker or dealer[,]" and Eleventh Circuit precedent dictates that nothing else is required. [D.E. 24, p. 9]. Our court, however, has taken a very different view. As Judge Reinhardt explained, "[w]hatever the precise parameters of a 'customer' for purposes of Rule 12200, at a minimum it requires a business relationship between the parties." *BNY Mellon Cap. Markets, LLC v. Paone*, No. 19-81412-CIV, 2019 WL 8362167, at *3 (S.D. Fla. Dec. 26, 2019) (denying motion to compel FINRA arbitration asserted by purported customer who had no tangible business relationship with FINRA member). That is consistent with the widely accepted principle that, though no precise definition exists in the statute or caselaw, a core definition of "customer includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *UBS Fin. Servs., Inc. v. West Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 649 (2d Cir. 2011) (citing an online FINRA glossary stated that a "customer" is "[a] person or entity (not acting in the capacity of an associated person or member) that transacts business

15

with any member firm and/or associated person."; *Webster's Third New Int'l Dictionary* 559 (3d ed. 2002)) (defining "customer" as "one that purchases some commodity or service" (def. 2a)); *American Heritage Dictionary of the English Language* 450 (4th ed. 2000) (defining customer as "[o]ne that buys goods and services")).

This contextual interpretation has been adopted by other circuits. The Fourth Circuit, for instance, has held that a "customer" is "one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business." *UBS Fin. Servs., Inc. v. Carilion Clinic,* 706 F.3d 319, 325 (4th Cir. 2013) (because "customer" is undefined, interpretation depends on context of other provisions such as Rule 12200 that provides that arbitrable disputes must arise in connection with the "business activities" of the FINRA Member, suggesting that a person must be a customer of a FINRA member's business activities to obtain arbitration). *See also Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014) (finding other circuits' analysis "persuasive" and "conclud[ing] that a 'customer' is a non-broker and non-dealer who purchases commodities or services from a FINRA member in the course of the member's FINRA-regulated business activities, i.e., the member's investment banking and securities business activities.").

With these principles in mind, Defendants' simplistic application of Rule 12200 holds little weight because, as the Ninth Circuit explained, the text of that rule "does not tell us what a 'customer' *is,* and because [ARC] is neither a broker nor a dealer,

16

the FINRA Rules' definition, standing alone, cannot tell us whether [ARC] fits the bill." *Id.* at 739 (emphasis in original). Looking at the case against ARC given the context of the Rule, ARC is not a customer as it does not engage in the purchase of commodities or services from a FINRA member. So compelled FINRA arbitration against ARC, absent an express agreement to arbitrate that does not exist, is not possible because ARC did not maintain "an account relationship, either individually or jointly, with [Shevland]. Similarly, they have not received any investment or brokerage services of any kind from [Shevland]." *BNY Mellon,* 2019 WL 8362167, at *3 (enjoining filing of FINRA arbitration action against purported customer).

Defendants' case for arbitration against ARC focuses on portions of Plaintiff's briefs wherein, in support of his unjust enrichment claim, he alleges that by completing his part of the bargain, he conferred benefits on both Orlando and ARC. According to Defendants, these allegations pull ARC within the scope of a "customer" for FINRA purposes. Although Defendants cite multiple cases in support of their claim, none of the cases provide actual support for their position.

Indeed, Defendants' cherry-picked reading of this caselaw distorts the holdings of these cases and misses the mark. For instance, Defendants cite *King* and *MONY* for their assertion of customer status for ARC. But they are clearly inapposite. In the first place, "[both *King* and *MONY*] turned on whether the customer of an associated person is also the customer of the broker-dealer who supervised the associated person, even if the broker-dealer had no knowledge of the transaction." *Pictet*, 2017 WL 10403345, at *6. Here, in contrast, Defendants have not asserted any supervision claims.

17

Second, and more fundamentally, Defendants ignore that embedded in these cases is the requirement that the party asserting customer status must *engage in some sort of transaction* with *either* the FINRA-member or the associated person. In other words, contrary to Defendants' theory that to meet the meaning of "customer" under FINRA a party must merely show that it is neither a broker nor a dealer, these cases recognize that to be a FINRA customer a party must actually engage in a transaction in its capacity as a customer. *See MONY*, 390 F.3d at 1344 ("there is no dispute that the [parties claiming customer status] were customers of [the associated person]"); *see also Pictet Overseas Inc. v. Helvetia Tr.*, No. 13-81088-CIV, 2017 WL 10403345, at *4 (S.D. Fla. Apr. 14, 2017) (observing that the Eleventh Circuit has deemed the idea of "direct transactional relationship" as an essential factor in determining a customer relationship). Unlike *King*, *MONY*, or another case they purport to rely on, *Viyella*, Shevland denies ever engaging in any sort of transaction with ARC, and the evidence of record does not show otherwise. Defendants do not point to any facts showing that ARC was considered a party to the investment agreement, that ARC purchased any good or services form Shevland, that ARC received investment advice from Shevland, or that ARC had any type of contractual relationship with ARC.[5]

---

[5] We pause to note that Defendants also mischaracterize *Viyella* by claiming that "[t]he *Viyella* court also rejected Shevland's central argument 'that Pictet limits the definition of a customer.'" [D.E. 24, p. 10]. But *Viyella* did *not* reject Pictet's "customer" analysis; rather, as noted above, that case simply refused to extrapolate *Pictet*'s analysis regarding the business activity question (second prong) into the definition of customer under FINRA. *See Viyella*, 2020 WL 977481 at *6 (observing that requiring a showing of nexus here would be redundant because "[t]he business activities requirement already restricts the bounds of FINRA arbitration.").

18

Because ARC cannot establish that it engaged in some sort of "transactional relationship" with Shevland we agree with Plaintiff that ARC does not qualify as a customer under FINRA.  *See also Pictet*, 2017 WL 10403345, at *6 (holding that parties failed to establish customer relationship where they admitted "they never had accounts, never bought or sold any securities and never had any contractual relationship with POI.").

### III.  *CONCLUSION*

Accordingly, it is ORDERED AND ADJUDGED that Defendants' motion to compel arbitration and stay the case pending completion of the arbitral proceedings, [D.E. 18], is **GRANTED only as to Defendant Orlando**.  Defendants' motion to compel arbitration and stay as to Defendant ARC is **DENIED**.  The case against ARC may proceed while any claims against Orlando will be Stayed pending completion of arbitration proceedings.  If no appeal/objections are filed to this Order, the parties shall confer and file a joint status report within 30 days that details whether any agreement is reached to stay the action against ARC pending that arbitration.  Otherwise, the current scheduling Order shall govern all proceedings against ARC.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 19th day of September, 2022.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge