UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-24324-CIV-GAYLES

BRIAN SHEVLAND,

    Plaintiff,

v.

PATRICK ORLANDO and
ARC GLOBAL INVESTMENTS II, LLC,

    Defendants.

_____/

### ARC'S LIMITED OBJECTION TO AND APPEAL FROM THE MAGISTRATE JUDGE'S ORDER ON DEFENDANTS' JOINT MOTION TO COMPEL ARBITRATION AND STAY CASE

Pursuant to 28 U.S.C. § 636(b)(1)(C), Federal Rule of Civil Procedure 72(b), and Southern District of Florida Magistrate Judge Rule 4.1(b), Defendant Global Investments II, LLC ("ARC") timely objects to and appeals from the Magistrate Judge's September 19, 2022 Order on Defendants' Joint Motion to Compel Arbitration and Stay the Case (the "Order/R&R") [ECF No. 45].[1] Specifically, ARC appeals from and objects to section II.D. of the Order/R&R (titled "Plaintiff's Claims Against ARC are not Arbitrable") and section III to the extent it provides

---

[1] In the Order/R&R, the Magistrate Judge noted that "given the hybrid nature of such a motion [to compel arbitration], the Court will enter an Order on the motion but the parties have leave to appeal, if desired, by seeking de novo review as if the Order was a Report and Recommendation." That is the correct approach. *See, e.g.*, *Deutsche Bank Sec., Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019) (Gayles, J.) (overruling objections to report and recommendation on motion to compel arbitration and agreeing arbitration was required). Moreover, there are no disputes of fact, thus all the issues presented are pure issues of law. ARC therefore exercises such leave and treats the Order as a "Report and Recommendation," and this Court's standard of review is therefore de novo. Fed. R. Civ. P. 72(b)(3). Accordingly, "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.*

1

CASE NO.: 21-24324-CIV-GAYLES

"Defendants' motion to compel arbitration and stay as to Defendant ARC is DENIED. The case against ARC may proceed while any claims against Orlando will be Stayed pending completion of arbitration proceedings." [ECF No. 45 at 15-19.] To be clear, ARC does not appeal the remainder of the Order/R&R as the Magistrate Judge correctly concluded claims against Defendant Orlando must be arbitrated.

The Order/R&R makes three substantial errors in incorrectly denying ARC's motion:

**First**, while the Order/R&R properly captures much of the background, it irreconcilably concludes that Shevland did not provide any services for ARC and overlooks critical evidence (apparently due to Shevland's obfuscation and confusion of the facts).

**Second**, the Magistrate Judge compounds the first error by applying an erroneously narrow interpretation of FINRA's definition of a "customer," inconsistent with controlling Eleventh Circuit precedent and recent Southern District of Florida case law applying that precedent. Both errors compel this Court to reject the Order/R&R's conclusion that ARC is not a "customer" and enter an order compelling arbitration.

**Third**, the Order/R&R separately errs in failing to properly resolve any doubts in favor of arbitration, appearing to flip the well-established presumption in favor of arbitration on its head. Especially in this case, where arbitration is proper as to Orlando, who is the president and CEO of ARC, it makes no sense to split the case in light of the presumption and in a practical sense would defeat the purposes of compelling arbitration as to Orlando. This Court should sustain ARC's objections and grant in full the Defendants' Joint Motion to Compel Arbitration and Stay the Case, [ECF No. 18] (the "Motion").

## BACKGROUND

Plaintiff Brian Shevland, a FINRA associated person, brought this lawsuit against Patrick Orlando, a FINRA associated person, in court rather than in FINRA arbitration. He also sued ARC.

2

CASE NO.:  21-24324-CIV-GAYLES

The complaint alleges: (1) breach of contract against Orlando; (2) breach of covenant of good faith and fair dealing against Orlando; (3) unjust enrichment against Orlando and ARC; and (4) declaratory judgment against Orlando and ARC. (*See generally* Compl. at p. 24, [ECF No. 1]).

It is undisputed that ARC is not registered with FINRA and is neither a broker nor dealer. It is further undisputed that Shevland is an "Associated Person" of a member of FINRA under the FINRA rules. In the complaint, Shevland alleges that he "conferred a benefit upon Orlando and ARC" and that ". . . ARC accepted and retained the conferred benefit." (Compl., ¶¶ 78, 79.) Shevland also requested specific performance as to ARC in his prayer for relief. (Compl. at p. 24.) Accordingly, accepting Shevland's basic allegations as true, ARC had a business relationship with Shevland for benefits Shevland provided it. And as explained below, that business relationship involved Shevland's soliciting investors to purchase ARC securities.

Under the FINRA rules that bind Shevland, disputes arising from a business relationship with an associated person (Shevland) require arbitration should a customer request it:

> Parties must arbitrate a dispute under the Code if:
>
> - Arbitration under the Code is . . . (2) Requested by the customer;
>
> - The dispute is between a customer and a member or associated person of a member; and
>
> - The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Rule 12200(b).[2] Furthermore, FINRA Rule 12100(k) defines a "customer" as "not includ[ing] a broker or dealer."

Given FINRA Rule 12200(b), ARC (jointly with Orlando) moved to compel arbitration and

---

[2] The FINRA Rules cited herein are located at https://www.finra.org/rules-guidance/rulebooks/finra-rules. This Court takes judicial notice of FINRA's website. *E.g.*, *SEC v.*

3

CASE NO.: 21-24324-CIV-GAYLES

stay or dismiss this case on the basis that Shevland must bring this action in FINRA arbitration. *See* Motion, [ECF No. 18]. In the Motion, ARC explained that it was a "customer" of Shevland under the FINRA rules because Shevland was finding and soliciting investors to purchase ARC securities (i.e., ARC LLC membership interests), with the idea those investors would eventually receive shares in a special purpose acquisition company ("SPAC") called Digital World Acquisition Company ("DWAC"). ARC was DWAC's sponsor. (Compl., ¶ 56 ("DWAC is sponsored by ARC.")). And as DWAC's sponsor, it owns DWAC's founder shares—i.e., shares issued prior to the IPO, the sale of which funds the creation and operations of the SPAC. Shevland could legally solicit potential ARC investors and receive transaction-based compensation (i.e., commissions) only because of his status as an associated person of a FINRA member. *See* 15 U.S.C. § 78o(a)(1), .

In response to the Motion, Shevland obfuscated and confused these facts, continuously sidestepping the critical but indisputable fact that he was soliciting investors for ARC—*i.e.*, acting as a broker-dealer. Shevland repeatedly characterized the services he performed as being on behalf of DWAC directly, but that was not the case. Some of the exhibits attached to Shevland's Complaint confirm the fundraising was directly for ARC, not DWAC. *See, e.g.*, Compl., at Ex. V [ECF No. 1-25] ("We are writing to inform you that as of last Thursday, August 5th, Digital World Acquisition Corp. was fully funded, *and therefore, our funding effort for ARCII is now closed*." (Emphasis added)); Ex. AA at 4 [ECF No. 1-30] ("[N]o further investments are being accepted for *ARCII/DWAC* at the risk capital level." (Emphasis added)).

On September 19, 2022, the Magistrate Judge issued the Order/R&R finding that arbitration

---

*Kornfeld*, No. 18-CV-23369, 2021 WL 5178834, at *5 n.2 (S.D. Fla. Sept. 28, 2021), report and recommendation adopted, No. 18-23369-CIV, 2021 WL 5178491 (S.D. Fla. Nov. 8, 2021). FINRA Rules 12000-12905 constitute FINRA's "Code of Arbitration Procedure for Customer Disputes."

4

CASE NO.:  21-24324-CIV-GAYLES

of the claims against Orlando was required, but disagreeing that ARC could compel FINRA arbitration. The Magistrate Judge concluded ARC was not a "customer," apparently based on Shevland's obfuscation and confusion of the facts coupled with an erroneously narrow interpretation of the definition of a "customer." Order/R&R at 19.

Try as he might, Shevland cannot deny he was finding investors for securities in ARC, which would *eventually* convert to securities in DWAC. While Shevland's efforts to confuse ARC and DWAC may have caused the Magistrate Judge to doubt Shevland performed services for ARC, the Magistrate Judge further erred in failing to resolve any such doubts in favor of arbitration. As fully elaborated below, ARC respectfully disagrees with the Magistrate Judge that it was not a "customer" of Shevland. Both as a matter of the undisputed evidence and as a matter of law, there is no doubt ARC qualifies as a "customer" of Shevland. And, even if there were any doubt, any such doubt must be resolved in favor of arbitration. ARC now submits these timely objections to the Order/R&R.

**MEMORANDUM OF LAW**

**I.  Due to Shevland's obfuscation, the Magistrate Judge did not consider the evidence of Shevland providing services to ARC in analyzing ARC's status as "customer."**

Given Shevland's efforts to disguise ARC as DWAC, the Magistrate Judge made critical errors in reviewing and understanding the evidence, resulting in the Magistrate Judge failing to consider evidence of Shevland's providing services to ARC. Specifically, the Magistrate Judge erred in concluding:

- "ARC is not a customer as it does not engage in the purchase of commodities or services from a FINRA member." Order/R&R at 17.

- ARC has "not received any investment or brokerage services of any kind from [Shevland]." *Id.*

CASE NO.: 21-24324-CIV-GAYLES

- "Shevland denies ever engaging in any sort of transaction with ARC, and the evidence of record does not show otherwise." *Id.* at 18.

- "Defendants do not point to any facts showing that ARC was considered a party to the investment agreement, that ARC purchased any good or services form Shevland, that ARC received investment advice from Shevland, or that ARC had any type of contractual relationship with [Shevland]." *Id.*

ARC objects to these erroneous conclusions.

The Magistrate Judge's recitation of facts in the "Background" section demonstrates the Magistrate's conclusions as to ARC are irreconcilable with Shevland's own allegations and should be rejected by this Court. For example, the Magistrate Judge recognizes in the Background section that "Following execution of the agreement, Shevland and Orlando worked together to build their next project, Digital World Acquisition Company (DWAC), *a SPAC sponsored . . . by* Orlando *and co-Defendant ARC*, and for which Orlando was Chairman and CEO." Order/R&R at 3 (emphasis added) (citing Compl., ¶26). Further, as the Magistrate Judge recognized, "According to Plaintiff, Orlando relied on him for guidance, support, and expertise to ensure that the launch of DWAC would be a success; and so it was." *Id.* The Magistrate Judge further recognized that "Shevland was instrumental in . . . *raising capital for DWAC*, thereby ensuring DWAC's success and subsequent enormous growth. Among other things, Orlando *asked Shevland to raise $5 million in investment capital for DWAC*, and Shevland's likeness, credentials, and experience were included in investor materials designed *to attract investment in DWAC*." Order/R&R at 4 (emphasis added) (citing Complaint ¶¶ 32-34). This is right, to the extent one remembers that DWAC, before its IPO, was *sponsored* by ARC, and any fundraising was therefore through ARC.

Indeed, the Complaint's prayer for relief and allegations make clear that Shevland was performing services for ARC. Most glaring, Shevland requests the Court "*Order specific performance of the SPAC Business Agreement, i.e.,* that Orlando *and ARC* make available the same

6

CASE NO.: 21-24324-CIV-GAYLES

number of DWAC shares for purchase by Shevland at a price of $0.003 per share, as were purchased by Orlando . . . ." (Compl. at p. 24 (emphasis added)). Further, Shevland's complaint alleges:

- *DWAC is sponsored by defendant ARC*. According to SEC filings, ARC held a total of 6,712,500 shares in DWAC as of September 2, 2021. A true copy of ARC's SEC Form 3, "Initial Statement of Beneficial Ownership of Securities," is attached hereto as Exhibit CC. According to ARC's SEC filings, "Patrick Orlando... is the managing member of the Sponsor and has voting and investment discretion with respect to the securities held by the Sponsor. As such, Mr. Orlando may be deemed to have beneficial ownership of the shares of Class B common stock held directly by the Sponsor." (Compl., ¶ 56 (emphasis added).)

- *Following the IPO, ARC transferred a total of 1,650,000 founder shares to a select group of anchor investors*, and purchased an additional 1,133,484 shares of Class A common stock at the IPO price of $10 per share. A true copy of ARC's September 8, 2021 SEC Form 4, "Statement of Changes in Beneficial Ownership," is attached hereto as Exhibit FF. Following this, ARC owned—and continues to own—a total of 6,623,484 shares in DWAC, 5,490,000 of which are "founder shares". A true copy of DWAC's September 8, 2021 SEC Schedule 13D reflecting ARC's total ownership is attached hereto as Exhibit GG. ARC purchased its "founder shares" at a price of $0.003 per share. See Exhibit DD at p. 15. (Compl., ¶ 60 (emphasis added).)

- "This is an alternative count for unjust enrichment if for any reason an enforceable express contract is not found to have been established between Shevland and Orlando. Regardless of the legal sufficiency of any alternative express contract claims in this Complaint, *Shevland conferred a benefit upon* Orlando and *ARC, who has knowledge of that benefit*." (Compl., ¶ 78 (emphasis added)).

- "Orlando and *ARC accepted and retained the conferred benefit*." (Compl., ¶ 79 (emphasis added).)

- "Under the circumstances, *it would be inequitable for* Orlando and *ARC to retain the benefit without paying for it*." (Compl., ¶ 80 (emphasis added).)

- "An actual controversy exists among Shevland, Orlando, *and ARC regarding the enforceability of the SPAC Business Agreement, as well as the parties' respective rights and obligations thereunder*." (Compl. ¶ 82 (emphasis added).)

- "Accordingly, Shevland seeks a declaration that: . . . (ii) the SPAC Business Agreement affords Shevland the right to purchase up to as many shares as Orlando at the same share price as Orlando in DWAC, as well as in any and all future SPACs sponsored by Orlando, including, without limitation, the SPACs known as 'Big 4' and 'Big 5'; (iii) Orlando **and ARC are obligated** to provide Shevland with the opportunity to purchase up to as many shares as Orlando at the same share price as Orlando in DWAC as well as in any and all

7

CASE NO.: 21-24324-CIV-GAYLES

future SPACs sponsored by Orlando, including, without limitation, the SPACs known as 'Big 4' and 'Big 5' . . . ." (Compl., ¶ 87 (emphasis added).)

Thus, the Magistrate Judge's conclusion that ARC has "not received any investment or brokerage services *of any kind* from [Shevland]," Order/R&R at 17 (emphasis added), cannot be reconciled with the unambiguous allegations of the Complaint[3] and the Magistrate Judge's concessions that (i) ARC was DWAC's sponsor, (ii) Orlando was ARC's Chairman and CEO, and (iii) Shevland was tasked with raising funds for DWAC. Shevland's reference to raising funds for DWAC, (as evidenced by the documents attached to Shevland's complaint) actuallly involved selling ARC securities as ARC was DWAC's sponsor and held all of DWAC's pre-IPO issued shares. Shevland was raising funds for ARC, especially since it was before DWAC shares were publicly available and ARC controlled DWAC's non-registered shares, which could only be transferred if (and only if) DWAC eventually combined with a business target.

Indeed, prior to the initial public offering of DWAC shares, ARC was the only owner of securities in DWAC. (*See* Compl., Ex. EE [ECF No. 1-34].) Thus, when Shevland alleges Orlando "asked Shevland to raise $5 million in capital for DWAC, promising Shevland that he would get a 'WHOLE LOTTA SHARES' in exchange for his involvement in DWAC," he could only have meant to raise $5 million in capital by selling ARC securities which would ultimately convert to DWAC securities upon DWAC's business combination with a target company. (*See* Compl., ¶ 32.) Likewise, when Shevland alleges, "Through significant effort that required him to drop other work projects, Shevland brought in a total of $2,330,000 in investments, distributing a total of 582,500 shares," (Compl., ¶ 42), he meant investments in ARC securities that would eventually become

---

[3] "On a motion to compel arbitration, the allegations of the complaint are taken as true." *SBMH Grp. DMCC v. Noadiam USA, LLC*, 297 F. Supp. 3d 1321, 1327 n.3 (S.D. Fla. 2017) (compelling arbitration where plaintiffs alleged defendant was a shareholder of a company and agreement at issue "applies to disputes between the company and any shareholder").

CASE NO.:  21-24324-CIV-GAYLES

DWAC shares. Shevland has to admit this in paragraph 44 of the Complaint, where he quotes from an email in which he indicates "it is time for me to close out my pre IPO work and make my personal investment in *sponsor shares*." (Compl., ¶ 44 (emphasis added).) "Sponsor shares" in that sentence can only mean securities in DWAC's sponsor, ARC. (*See also, e.g.*, Compl., Ex. V [ECF No. 1-25] ("We are writing to inform you that as of last Thursday, August 5th, Digital World Acquisition Corp. was fully funded, *and therefore, our funding effort for ARCII is now closed*." (emphasis added)); Ex. AA at 4 [ECF No. 1-30] ("[N]o further investments are being accepted for ARCII/DWAC at the risk capital level.").) It is settled law that, "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

Although a close review of the allegations in the Complaint make clear Shevland was performing services for ARC and the Magistrate Judge erred in concluding otherwise, for the avoidance of doubt, ARC submits a copy of the subscription agreement with which Shevland was gathering investors.[4] Ex. 1 hereto. The subscription agreement is titled "ARC GLOBAL INVESTMENTS II LLC, SPONSOR OF DIGITAL WORLD ACQUISITION CORP., SUBSCRIPTION AGREEMENT." *Id.*  It further provides in pertinent part:

> The undersigned commits to purchase limited liability company interests ("LLC Interests") of [ARC] for an aggregate purchase amount of between $100,000.00 and $1,000,000.00 ($_____) ("Purchase Amount") for an effective price of Four Dollars ($4.00) ("Effective Price") per share of Class B common stock of the SPAC ("Founder Shares") held by [ARC].

*Id.* This is undisputed, but Shevland obfuscated this in his Complaint and filings with the Court by playing fast and loose with his references to DWAC. Indeed, why else would he have sued ARC

---

[4] As noted in footnote 1 *supra*, "[t]he district judge may . . . receive further evidence . . . ." in considering objections to a magistrate judge's Report and Recommendation. Fed. R. Civ. P. 72(b)(3).

CASE NO.:  21-24324-CIV-GAYLES

and alleged he conferred benefits on ARC if he wasn't performing services for ARC? For all these reasons, therefore, the record evidence demonstrates the Magistrate Judge erred in concluding there was no evidence that Shevland performed services for ARC, and ARC's objections should be sustained.

### II. The Magistrate Judge further erred in narrowly interpreting "customer" within the meaning of FINRA's rules and determining that ARC is not a "customer."

Central to the Order/R&R was an erroneous interpretation of the term "customer" in the FINRA Arbitration code that the Eleventh Circuit has rejected. The FINRA code defines a "customer" as "not include[ing] a broker or dealer." And, as this Court recognized and quoted, the Eleventh Circuit has held that someone "is a customer as long as she is not a broker or dealer; *nothing in the Code directs or otherwise requires more*." *Simon*, 2019 WL 4685876, at *2 & n.1 (Gayles, J.) (emphasis added) (quoting *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364 (11th Cir. 2004)); *see also Viyella v. Nicor*, No. 19-25094-CIV, 2020 WL 977481, at *5 (S.D. Fla. Feb. 28, 2020), *appeal dismissed sub nom. Viyella v. Fundacion Nicor*, No. 20-11224-BB, 2020 WL 5755844 (11th Cir. July 14, 2020) (applying definition employed in *King*). In *King*, the Eleventh Circuit even rejected extrinsic evidence regarding the rule's intent because "the rules at issue are clear and unambiguous." *King*, 386 F.3d at n.3.

Notably, regarding the issue of ARC's status as a customer, the Magistrate Judge did not even discuss this Court's decision in *Simon*, while observing "[o]ur court, however, has taken a very different view" and citing to decisions from other circuits, noting the "*contextual* interpretation has been adopted by other circuits." Order/R&R at 15 & 16 (emphasis added). Of course, as this Court recognized in *Simon*, this Court is bound by the Eleventh Circuit. *See also JPay, Inc. v. Kobel*, 904 F.3d 923, 940 (11th Cir. 2018) ("In the first place, we are bound to follow our own Circuit precedent."). The Magistrate Judge's choice to follow other circuits and lower

10

court orders was error alone, and such legal conclusions should be rejected. *Generali v. D'Amico*, 766 F.2d 485, 489 (11th Cir. 1985) (holding "authority from one circuit of the United States Court of Appeals is not binding upon another circuit"); *see also Camreta v. Greene*, 563 U.S. 692, 708 n.7 ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

Instead of following the Eleventh Circuit, the Magistrate Judge principally cites to *BNY Mellon Capital Markets, LLC v. Paone*, No. 19-81412-CIV, 2019 WL 8362167 (S.D. Fla. Dec. 26, 2019), and *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*, 660 F.3d 643 (2d Cir. 2011). Reliance on *BNY Mellon* is problematic as it fails even to mention the Eleventh Circuit's decision in *King*. *See generally BNY Mellon*, 2019 WL 8362167. Further, *BNY Mellon* is distinguishable in that the plaintiff there submitted an affidavit stating:

> A review of BNYM Capital's corporate records confirms that [Defendants] are not, and have never been, customers of BNYM Capital. In other words, they have not maintained an account relationship, either individually or jointly, with BNYM Capital. Similarly, they have not received any investment or brokerage services of any kind from BNYM Capital.

*Id.* at *3 (S.D. Fla. Dec. 26, 2019). In contrast, here there is evidence ARC *did* obtain services from Shevland as Shevland has alleged in his Complaint and as evidenced by the ARC subscription agreements for which Shevland was soliciting investors. *See supra* section I.

Likewise, the Magistrate's reliance on *UBS Financial Services, Inc.* does not render ARC a non-customer. Notably, in that Second Circuit case, contrary to the Eleventh Circuit's controlling precedent, the Second Circuit went beyond the plain language of the rule. It did not actually rule, however, but rather noted "the parties conceded at oral argument, that 'customer' means 'someone who buys goods or services.'" *UBS Fin. Servs., Inc.*, 660 F.3d at 650. The Second Circuit then noted it did not have to provide a definition and that "[t]he term 'customer' includes *at least* a non-

11

broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *Id.* (emphasis added). Notably, the Second Circuit also did not discuss the Eleventh Circuit's decision in *King*.

Even still, the decision in *UBS Financial Services, Inc.* actually supports a finding that ARC was Shevland's "customer" as defined by the FINRA rules. As noted above, the Second Circuit's use of the words "at least" show it took a broad view of the definition of customer. *Id.* Further, the Second Circuit found a customer relationship where "WVUH purchased a service, specifically auction services, from UBS." *Id.* The Second Circuit rejected UBS's contention that "FINRA has a narrow 'investor-protection mandate,' such that 'customers' should include only those receiving 'investment or brokerage services.'" *Id.* at 652. ARC's relying on Shevland to secure investors in ARC securities in exchange for compensation to Shevland fits squarely within the definition of "customer" employed by the Second Circuit in *UBS Financial Services, Inc.*

Other decisions, including from this District, confirm the Magistrate Judge erroneously concluded that ARC is not a "customer." Most recently, in *Tradespot Markets Inc. v. Icaro Media Group Inc.*, No. 21-CIV-62295-RAR, 2022 WL 3701201 (S.D. Fla. Apr. 1, 2022), the court compelled arbitration where a FINRA member provided "contractual services as placement agent/financial advisor for [a non-FINRA entity], which resulted in $5,000,000 in sales for [the non-FINRA entity]." *Id.* at *1. The FINRA entity sued, alleging "that they have not been paid for these services." *Id.* The court had little difficulty in finding the non-FINRA entity a "customer" where the FINRA member "agreed to accept a fee for its services when the parties' Agreement was executed—and Defendant, a non-broker and non-dealer, undertook to purchase Plaintiff's services." *Id.* at *2. This is essentially Shevland's complaint in a nutshell: Shevland is alleging he

CASE NO.: 21-24324-CIV-GAYLES

has not gotten his end of the bargain for services as a placement agent for ARC. Just as the non-FINRA entity seeking investments in *Tradespot Markets Inc.*, ARC is a "customer."[5]

A direct agreement with ARC is not required. This is not an issue of first impression in this District. In *Raymond James Financial Services, Inc. v. Armijos*, No. 19-CIV-81692-RAR, 2020 WL 2026316 (S.D. Fla. April 27, 2020), the court compelled arbitration and found "the absence of a direct customer relationship between [the FINRA Member] and the Defendants is of no moment." *Id.* at *6. The court explained that "the unambiguous language of the Code . . . makes clear that the definition of 'customer' is broad." *Id.* Confronted with the same logic employed by the Order/R&R here, the *Armijos* court explained that in *King* the Eleventh Circuit "found that the plaintiff's interpretation would read 'a limitation into the Code that is absent from its language.'" *Id.* (quoting *King*, 386 F.3d at 1364). "In sum, there is no requirement that a party directly transact with a FINRA member to qualify as a "customer" for purposes of Rule 12200." *Id.*; see also *King*, 386 F.3d at 1364 (rejecting lack of agreement with member and observing "[t]he parties agree that King dealt with Micciche, so King, in turn, dealt with IFG."). Yet, the Magistrate Judge did not

---

[5] Indeed, courts all over have time and again found that a FINRA Member or Associated Person's assistance in securing investors for an entity or similar work renders that entity a "customer." *E.g.*, *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014) (holding municipality "easily qualifies as Goldman's 'customer'" because Goldman among other services, "served as the underwriter . . . and as the broker-dealer" in connection with an issue of bonds"); *UBS Fin. Services, Inc. v. Carilion Clinic*, 706 F.3d 319 (4th Cir. 2013) (holding entity was a "customer" where it "purchased underwriting and auction services from UBS and Citi"); *Alabaykan Holding Co., Ltd. v. Tobin & Co. Sec. LLC*, No. CV 21-1502 (SCC), 2021 WL 5749851, at *4 (D.P.R. Dec. 1, 2021) (finding customer relationship where FINRA Associated Persons secured interest-bearing loans as investments for a fee); *CRT Cap. Grp. v. SLS Cap., S.A.*, 63 F. Supp. 3d 367, 380 (S.D.N.Y. 2014) (finding customer relationship where "SLS Capital retained CRT Capital to serve as an advisor in relation to a Senior Life Settlement Asset Backed Securitization Bond issue"); *Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 397 (E.D.N.Y. 2014) (agreeing with Defendants that "because Tehan provided them with a service—investment advice and an introduction, and at least some effort to facilitate the B & B transaction—and received 'transaction—based selling compensation' from B & B as a result, it follows that defendants were his customers").

13

address *Armijos* and instead concluded "Because ARC cannot establish that it engaged in some sort of 'transactional relationship' with Shevland we agree with Plaintiff that ARC does not qualify as a customer under FINRA." Order/R&R at 16.

Therefore, given that ARC is neither a broker or dealer, "nothing in the Code directs otherwise or requires more" for ARC to be a "customer." *King*, 386 F.3d at 1364. And Shevland is a FINRA "associated person." That is enough. But, even taking the narrower definition of a "customer" employed by the Magistrate Judge, ARC remains a customer because it obtained services from Shevland that have been recognized by courts all over to require arbitration of disputes arising from such services. The Court should therefore sustain ARC's objections to the legal conclusion that ARC is not a "customer."

> III. **Even if there was any doubt as to ARC's status as a customer, the Magistrate Judge's determination conflicted with the duty to resolve all doubts in favor of arbitration.**

The United States Supreme Court has made clear that the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original) (citing 9 U.S.C. §§ 3, 4). The FINRA Rules "serve[] as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants." *King*, 386 F.3d at 1367 (considering FINRA rule predecessor, NASD code).  Moreover, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 n. 8 (1995) (quoting

*Moses H. Cone* with approval). As expressed in *Moses H. Cone*, strong public policy favors arbitration over litigation as a vehicle for the economical resolution of disputes. Arbitration is shorter and more economical for the parties and it relieves congested court dockets, thereby conserving judicial resources. Thus, any doubts are resolved in favor of arbitration. *Id*. In keeping with the strong federal policy in favor of arbitration, ultimately "[t]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 92 (2000).

Given that the Magistrate Judge concluded that the claims directed at Orlando are clearly arbitrable, any doubts as to claims directed to ARC should have also been compelled to arbitration. ARC and Orlando are inextricably intertwined. The Complaint repeatedly references them as a package. The issues and relief are inextricably intertwined. Sending one set of claims to arbitration and allowing the others to continue in this Court will defeat the purpose of FINRA arbitration. Shevland will unfairly be able to seek broad discovery in this Court that undoubtedly will not be allowed in the FINRA arbitration, while Orlando's hands will be tied. The cases will likewise proceed at different paces and might result in conflicting relief or inconsistent results. At bottom, Shevland has not proven that the claims against ARC are "unsuitable for arbitration." *Randolph*, 531 U.S. at 92; *see also, e.g.*, *Precision Funding Grp., LLC v. Nat'l Fid. Mortg.*, No. CIV. 12-5054 RMB/JS, 2013 WL 2404151, at *7 (D.N.J. May 31, 2013) (compelling nonsignatory to join pending arbitration and observing "it is difficult to conceive of an employment case where the claims subject to a pending arbitration and the claims at issue in a pending federal lawsuit are more closely aligned than they are in this case . . . . NFM is seeking to compel PFG to arbitrate essentially the same claims PFG is arbitrating with Itri and Prizzi"). As the Supreme Court recognized in the context of collective bargaining arbitration, "An order to arbitrate the particular grievance should

CASE NO.: 21-24324-CIV-GAYLES

not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960).

Here, by being a FINRA associated person, Shevland has indisputably submitted to the FINRA rules and the arbitration of disputes regarding fundraising and services pertaining to securities. And, given the definition of customer is just that a party not be a "broker or dealer," *see* section II *supra*, it cannot "be said with positive assurance that" the definition of customer does not apply to ARC as the plain language requires ARC solely to not be a broker or dealer. Therefore, "[d]oubts should be resolved in favor of coverage." *Id.* Stated differently, the Eleventh Circuit "assume[s] [parties'] intent to arbitrate anything not specifically excluded." *JPay, Inc. v. Kobel*, 904 F.3d 923, 929 (11th Cir. 2018). ARC is not "specifically excluded" by the plain language of the definition of customer. The Magistrate, however, resolved his doubts against coverage. This too was error, and the Court should therefore sustain ARC's objections and compel arbitration of all claims, not just those directed to Orlando.

## CONCLUSION

For all these reasons, this Court should sustain ARC's objections and grant in full the Defendants' Joint Motion to Compel Arbitration and Stay the Case.

CASE NO.: 21-24324-CIV-GAYLES

Dated: October 3, 2022

                Respectfully Submitted:

                SALLAH ASTARITA & COX, LLC

                Counsel for ARC Global Investments II, LLC
                3010 North Military Trail, Suite 210
                Boca Raton, FL 33431
                Tel.: (561) 989-9080
                Fax: (561) 989-9020
                By: *s/*Joshua A. Katz
                    James D. Sallah, Esq.
                    Fla. Bar No. 0092584
                    Email: jds@sallahlaw.com
                    Joshua A. Katz, Esq.
                    Fla. Bar No. 0848301
                    Email: jak@sallahlaw.com

### Certificate of Service

I certify that on September 30, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

                /s/Joshua A. Katz
                **Joshua A. Katz, Esq.**