**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-24324-CIV-GAYLES**

BRIAN SHEVLAND,

     Plaintiff,

v.

PATRICK ORLANDO and
ARC GLOBAL INVESTMENTS II, LLC,

     Defendants.

_____ /

**ARC'S REPLY IN SUPPORT OF LIMITED OBJECTION
TO AND APPEAL FROM THE MAGISTRATE JUDGE'S ORDER
ON DEFENDANTS' JOINT MOTION TO COMPEL ARBITRATION AND STAY CASE**

     Defendant ARC Global Investments II, LLC ("ARC") timely files this reply in support of its

Objection to the Order/R&R.[1]

**INTRODUCTION**

     Here he goes again. In his Response, Shevland does more of the same—he obfuscates the

work he was doing and the shares to which he claims to have been entitled to hide the simple fact

that he was selling ARC securities (which is evidenced in his own allegations and the 33 exhibits

cited in his Complaint)—a fact that makes ARC his customer. Just because he keeps saying he did

not perform services for ARC, however, does not make it so. The evidence and law show the

contrary. As a result, and consistent with compelling to arbitration the claims against Orlando (to

_____

[1] The Objection/Appeal is docketed as ECF No. 46 and will be referred to as the "Objection." As in the Objection, ARC will continue to refer to the Magistrate Judge's order, ECF No. 45, as the "Order/R&R." Shevland's response to the Objection/Appeal, docketed as ECF No. 47, will be referred to as the "Response."

CASE NO.:  21-24324-CIV-GAYLES

which Shevland now does not object), this Court must compel Shevland's claims against ARC to arbitration as well.

The salient issue is simple: Shevland, a financial advisor registered with a FINRA member firm, admits he sold ARC securities (which eventually could entitle the holder to DWAC shares), he did so for compensation (the ability to purchase ARC securities at a discount), and only registered securities brokers can receive compensation for selling securities.  Selling ARC LLC interests for compensation means Shevland was providing services to ARC, the issuer of the LLC interests. Therefore, ARC was Shevland's customer under the FINRA rules and applicable case law.

Reviewing the undisputed facts at a more granular level: ***ARC is the sponsor of DWAC. ARC is the entity for which Shevland was raising money, not DWAC***.  (Resp. at 8); (D.E. 46-1). The funds raised by Shevland were delivered to ARC, and the investors received membership interests in ARC, not DWAC.  (D.E. 46-1.) Ultimately, DWAC did not get funds from any of Shevland's contacts.  (Resp. at 4.) As its sponsor, ARC holds the founder shares (Class B shares) of DWAC. DWAC was preparing for an IPO to the public to issue Series A shares and warrants. The difference between the Shares offered to the public via the IPO (Class A) and the founder shares held by ARC (Class B) is this: the capital raised from the sale of IPO shares is held in escrow to permit the Class A shareholders to redeem their shares for cash if DWAC cannot complete a business combination in the allotted time or if the shareholder elects to redeem prior to DWAC's business combination. DWAC S-1, Compl. Ex. DD, ECF No. 1-33 at 1. Founder shares (Class B) are different: they are restricted securities that generally cannot be transferred until after DWAC completes a business combination. There is no redemption option with founder shares (therefore the capital raised from their issuance is used to operate DWAC), and if DWAC does not

CASE NO.:  21-24324-CIV-GAYLES

complete a business combination in the allotted time, the shares are virtually worthless. DWAC has not yet completed a business combination.

ARC holds DWAC's founder shares. Orlando is the sole principal of ARC. Shevland's so-called "fundraising for DWAC" is a misnomer—he was in reality selling ARC LLC interests that corresponded to the founder shares held by ARC.[2] Shevland concedes this in his Response. Resp. at n.2.  These LLC interests could convert to shares of DWAC only after (if ever at all) DWAC conducted an IPO and completed a business combination. Simply put, Shevland performed services for ARC, and ARC was Shevland's customer.

## **ARGUMENT**

1. **The fact that Shevland's "work" was selling ARC LLC interests for compensation makes ARC Shevland's customer, and that ends this inquiry.**

Shevland, a financial advisor, was selling ARC LLC interests to investors on ARC's behalf. And as he alleged, ARC compensated him for his fundraising activities through the opportunity to purchase ARC LLC interests that correspond to founders shares at a discounted rate (i.e., the same price that Orlando paid). Resp. at 5. Under these facts, as briefed in the Objection, ARC was Shevland's customer for investment banking services and this is sufficient to compel him to arbitration under FINRA rules. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741 (9th Cir. 2014) (holding municipality "easily qualifies as Goldman's 'customer'" because Goldman "served as the underwriter . . . and as the broker-dealer" in connection with an issue of bonds"); *UBS Fin. Services, Inc. v. Carilion Clinic*, 706 F.3d 319 (4th Cir. 2013) (holding entity was a "customer" where it "purchased underwriting and auction services from UBS and Citi"); *Alabaykan Holding Co., Ltd. v. Tobin & Co. Sec. LLC*, No. CV 21-1502 (SCC), 2021 WL 5749851, at *4 (D.P.R. Dec.

---

[2] ARC, in turn would use these funds to pay for the expenses related to DWAC's IPO and operations.

CASE NO.:  21-24324-CIV-GAYLES

1, 2021) (finding customer relationship where FINRA Associated Persons secured interest-bearing loans as investments for a fee); *CRT Cap. Grp. v. SLS Cap., S.A.*, 63 F. Supp. 3d 367, 380 (S.D.N.Y. 2014) (finding customer relationship where "SLS Capital retained CRT Capital to serve as an advisor in relation to a Senior Life Settlement Asset Backed Securitization Bond issue"); *Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 397 (E.D.N.Y. 2014) (agreeing with Defendants that "because Tehan provided them with a service—investment advice and an introduction, and at least some effort to facilitate the B & B transaction—and received 'transaction—based selling compensation' from B & B as a result, it follows that defendants were his customers").

Importantly, Shevland does not dispute the legal application or correctness of those decisions anywhere in his Response. He does not even address them. Instead, he tries to avoid those decisions and the result they mandate by obfuscating reality through his use of ARC and DWAC interchangeably. For example, in his Response, Shevland claims that he "was raising capital for DWAC because of the SPAC Business Agreement *with Orlando*, not because of any purported relationship with ARC." Resp. at 8. But, Shevland does not allege or argue that he actually sold a single DWAC share to anyone. Indeed, he could not make such an allegation because it is not true. What is true is that he did sell ARC LLC interests. And the purported SPAC Business Agreement that Shevland alleged to have entered can only be cognizable as an agreement between Shevland and Orlando on behalf of ARC (Orlando is its sole member and manager[3]). Indeed, the only way Shevland could purchase founder shares at the same price as Orlando was if ARC sold Shevland its LLC interests (they are restricted and non-transferable by anyone other than ARC). Shevland as much as admits this when he concedes that ARC is the "holding company

---

[3] *See* DWAC S-1/A, at 123, available at:
https://www.sec.gov/Archives/edgar/data/1849635/000110465921113541/tm2127035d1_424b4.htm#m04.

4

CASE NO.:  21-24324-CIV-GAYLES

for the shares in DWAC whose ownership is now in dispute." Resp. at 8. In other words, the only way Orlando could possibly agree to what Shevland alleges is as ARC's agent. The fact that Shevland, a financial advisor, was actually selling ARC LLC interests and not DWAC shares is dispositive—courts look to what the actual security is. *See generally, e.g.*, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus.*, ___ F.4th ___, 2022 WL 4587488, at *8 (2d Cir. Sept. 30, 2022) (holding that investors of SPAC had no standing to sue SPAC target for fraud as shareholders did not directly purchase target's shares).  Indeed, Shevland is suing and seeking relief from ARC, not DWAC.

Shevland also attempts to steer the Court away from the basic facts by raising for the first time a red herring argument that "Florida caselaw regarding unjust enrichment makes clear, a party may confer a benefit on another party that warrants compensation without privity or a direct relationship between those parties." Resp. at 9. However, the federal district court decisions Shevland relies on are not in accord with current Florida law on unjust enrichment established by the Florida courts.  What Florida law requires, and what Shevland's argument omits, is that "the plaintiff must *directly* confer a benefit to the defendant" for an unjust enrichment claim.  *CFLB P'ship, LLC v. Diamond Blue Int'l, Inc.*, 2022 Fla. App. LEXIS 5917, at *5 (Fla. 3d DCA August 31, 2022) (emphasis in original) (quoting *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017)).  As the Third DCA explained in *Diamond Blue*, "we recognize our decision in this matter may not be in accord with certain federal district court orders relied upon by Plaintiffs and the trial court. . . . We are bound, however, by the [Florida] Supreme Court's decision in *Kopel*."  2022 Fla. App. LEXIS 5917, at *8.  Of course, Shevland could only have directly conferred a benefit to ARC by performing work or services for or on behalf of ARC. ARC was therefore Shevland's customer.

CASE NO.:  21-24324-CIV-GAYLES

In his Response, Shevland notes that he "also brought a claim for unjust enrichment against ARC, who, as DWAC's sponsor, benefited from Shevland's work under the SPAC Business Agreement and now holds the shares that Shevland was denied." Resp. at 2. However, he shies away from his allegations that ARC "has knowledge of that benefit" and "accepted and retained the conferred benefit," (Compl., ¶¶ 78-79.) He further now claims that "ARC was not a party to the SPAC Business Agreement," Resp. at 4, while in his complaint he brings ARC into the controversy "regarding the enforceability of the SPAC Business Agreement, as well as the parties' respective rights and obligations thereunder." (Compl. ¶ 82.) Clearly, Shevland believes that the SPAC Business Agreement governs ARC.

**2.  Shevland's reliance on *Pictet* is misplaced.**

Shevland spends much of his Response relying on the definition employed in the unpublished decision *Pictet Overseas Inc. v. Helvetia Trust* ("*Pictet I*"), 2017 WL 10403345, at *5 (S.D. Fla. Apr. 14, 2017), which definition Shevland erroneously claims the Eleventh Circuit affirmed in *Pictet Overseas Inc. v. Helvetia Trust*, 905 F.3d 1183, 1189 (11th Cir. 2018) ("*Pictet II*"). A close reading of *Pictet II* makes clear the Eleventh Circuit did no such thing. In *Pictet II*, the Eleventh Circuit's opinion focused entirely on "the type of claims raised by the Trusts." *Id.* at 1188. The Eleventh Circuit concluded that an issue is subject to FINRA arbitration "only when the dispute arises in connection with the business activities of the associated person undertaken in his or her capacity as an associated person of the FINRA member." *Id.* Because the Eleventh Circuit concluded that the trust's claims did not, the court did not go into whether the trust was a "customer." *Id.* ("We need not address the first two, because we agree with the district court that the Trusts' claims did not arise in connection with Pictet Overseas' or the Partners' business activities."). *Id.* Here, there is no dispute that Shevland's selling of ARC LLC interests (*i.e.*,

CASE NO.:  21-24324-CIV-GAYLES

securities) was not "unrelated to his . . . relationship with the FINRA member." *Id.* at 1189. Thus, *Pictet II* does not inform this discussion.

In addition to *Pictet II* being inapposite, the decisions that ARC cited, *King* and *Mony*, remain good law and govern. In his Response, Shevland claims the Magistrate considered the cases as a whole while ARC relies on "the one sentence from *King* that bolsters ARC's argument in a vacuum without regard to the actual facts or holding of *King*." Resp. at 10. Except, that one sentence is what matters here and is the broad proposition for which those decisions stand: the rules "unambiguously provide that King is a customer as long as she is not a broker or dealer; nothing in the Code directs otherwise or requires more." *Multi-Financial Sec., Corp. v. King*, 386 F.3d 1364, 1368 (11th Cir. 2004) (emphasis added). Shevland goes to pains to avoid restating that holding as it dooms his argument that ARC cannot qualify as a "customer." Nothing in the facts of this case is *inconsistent* with the facts in *King* and *Mony*: ARC is neither a broker nor dealer, and Shevland was performing services for ARC that he could only legally perform due to his status as a FINRA Associated Person.

Further, tellingly, Shevland does not even attempt to defend the Magistrate's reliance on *BNY Mellon Capital Markets, LLC v. Paone*, No. 19-81412-CIV, 2019 WL 8362167 (S.D. Fla. Dec. 26, 2019) and *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*, 660 F.3d 643 (2d Cir. 2011). Nor does Shevland address *Viyella v. Nicor*, No. 19-25094-CIV, 2020 WL 977481, at *5 (S.D. Fla. Feb. 28, 2020), which ARC cited and applied the definition employed in *King*. At best, Shevland claims the Magistrate followed the Eleventh Circuit in reading into the definition of customer extra terms that are not present, a proposition clearly at odds with *King*'s unambiguous holding.

CASE NO.:  21-24324-CIV-GAYLES

In a "gotcha moment," Shevland then suggests that *Tradespot Markets. Inc. v. Icaro Media Group. Inc.*, No. 21-CIV-62295-RAR, 2022 U.S. Dist. LEXIS 156261, at *5 (S.D. Fla. Mar. 31, 2022), a case cited by ARC for illustrative purposes, somehow overturned the Eleventh Circuit's holding on the definition of customer. It did no such thing, nor could it. The clarification referenced therein is not at odds with the Eleventh Circuit's definition, but merely confirmatory that someone "who, while not a broker or dealer, either '(1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member'" qualifies as a customer. *Id.* And, making Shevland's point stranger still, ARC clearly "purchase[d] a good or service from" him, a FINRA Associated Person. Although he claims he did not deal directly with ARC while simultaneously seeking relief from ARC for compensation, *Tradespot Markets. Inc.* involved the same types of services and claim of a lack of compensation.

Indeed, perhaps even more telling is both the Magistrate's and Shevland's failure to address *Raymond James Financial Services, Inc. v. Armijos*, No. 19-CIV-81692-RAR, 2020 WL 2026316 (S.D. Fla. April 27, 2020), which also cited to *King*. As Shevland failed to address, the *Armijos* court found "the absence of a direct customer relationship between [the FINRA Member] and the Defendants is of no moment" because "the unambiguous language of the Code . . . makes clear that the definition of 'customer' is broad" and to conclude otherwise *"*would read 'a limitation into the Code that is absent from its language.'" *Id.* (quoting *King*, 386 F.3d at 1364). Rather than grapple with this, Shevland erroneously reasserts a contractual relationship is required. This Court has itself recognized and quoted the Eleventh Circuit's holding in *King* that someone "is a customer as long as she is not a broker or dealer; *nothing in the Code directs or otherwise requires more.*" *Deutsche Bank Sec., Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4685876, at *2 & n.1

CASE NO.:  21-24324-CIV-GAYLES

(S.D. Fla. Sept. 26, 2019) (Gayles, J.) (emphasis added) (ordering that FINRA arbitration was required).

### 3.  Even if ARC is Not a Customer, ARC May Compel Arbitration.

Orlando is the sole member of ARC. (Compl. ¶ 3.)  Count III for unjust enrichment and Count IV for declaratory relief are asserted against both Orlando and ARC jointly, and are predicated on the same background allegations.  (Compl. ¶¶ 77, 81.)  The Complaint alleges "[a]n actual controversy exists among Shevland, Orlando, *and* ARC regarding the enforceability of the SPAC Business Agreement, as well as the parties' respective rights and obligations thereunder." Compl. ¶ 82 (emphasis added). Furthermore, Shevland's response asserts that ARC, as DWAC's sponsor, benefited from Shevland's work under the SPAC Business Agreement with Orlando and now holds the shares that Shevland was allegedly denied.  Resp. at 2.  Counts III and IV as against Orlando were found to be arbitrable, and Shevland does not object to that finding.

Under these circumstances, ARC may also compel arbitration of Counts III and IV even if it is not a customer of Shevland.  *E.g.*, *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947-48 (11th Cir. 1999) (discussing various grounds that allow nonsignatories to a contract to compel a signatory to arbitrate); *PFS Invs., Inc. v. Imhoff*, No. 11-10142, 2011 U.S. Dist. LEXIS 31417, at *21-22 (E.D. Mich. Mar. 25, 2011) ("It is beyond dispute that the non-FINRA members named as defendants in Imhoff's state-court action have a close relationship with the remaining Primerica entities. The firms are subject to common ownership and Imhoff alleges that they acted in concert to deprive him of commissions. As these non-FINRA members have sought arbitration, it is appropriate to compel arbitration of Imhoff's claims against them. . . . The Court concludes that equitable estoppel is appropriate here, as Imhoff's allegations involve concerted misconduct by the defendants. It would be inequitable to allow Imhoff to avoid arbitration of his claims simply

CASE NO.:  21-24324-CIV-GAYLES

by naming non-FINRA members as defendants."); *Griffis v. Wells Fargo Advisors, LLC*, No. 13 CV 8372, 2014 U.S. Dist. LEXIS 90688, at *15-16 (N.D. Ill. July 3, 2014) (holding that common law contract and agency principles permitted a non-signatory to compel arbitration under FINRA rules). Shevland did not even address this argument raised in the Objection that the claims are so inextricably intertwined. These additional authorities only bolster this unaddressed argument.

On the other hand, if Shevland's contention that he did not perform services for ARC were true, then he added ARC merely as a relief defendant to his dispute with Orlando. ARC should therefore be a relief defendant in the arbitration. It should not be subject to litigation before any determination of liability is made with respect to Shevland's dispute with Orlando.[4] If anything, keeping ARC as a litigant is putting the cart before the horse and risks inconsistent results. Although Shevland argues otherwise, at best the Magistrate harbored doubts as to ARC's involvement due to Shevland's obfuscation, but erred in failing to resolve those doubts in favor of arbitration. Thus, given all these factors, "unlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *King*, 386 F.3d at 1367 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (internal quotations omitted)).

---

[4] At the very least, the claims against ARC should be stayed pending arbitration of the predominate and overlapping claims against Orlando, ARC's sole principal, and this case administratively closed. *E.g.*, *Wilson v. Trans Union, LLC*, No. 6:18-cv-257-Orl-28KRS, 2018 U.S. Dist. LEXIS 113425, at *2-3 (M.D. Fla. June 20, 2018) ("The Supreme Court has noted that in some cases…it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. . . . Crucial to this determination is whether arbitrable claims predominate or whether the outcome of the nonarbitrable claims will depend upon the arbitrator's decision. . . . Courts have found it appropriate to stay litigation of nonarbitrable claims when considerations of judicial economy and avoidance of confusion and possible inconsistent results militate in favor of staying the entire action.") (quotation marks and citations omitted); *GHM (South Beach) Ltd. Liab. Co. v. Setai Owners Ltd. Liab. Co.*, No. 1:12-cv-21932-KMM, 2012 U.S. Dist. LEXIS 186763, at *20 & n.11 (S.D. Fla. Sep. 20, 2012) (staying non-arbitrable claims pending resolution of claims referred to arbitration, under circumstances similar to this case).

CASE NO.:  21-24324-CIV-GAYLES

## CONCLUSION

For all these reasons and the reasons in ARC's Appeal/Objections, this Court should sustain ARC's objections and grant in full the Defendants' Joint Motion to Compel Arbitration and Stay the Case.

CASE NO.:  21-24324-CIV-GAYLES

Dated: October 21, 2022

Respectfully Submitted:

SALLAH ASTARITA & COX, LLC

Counsel for ARC Global Investments II, LLC
3010 North Military Trail, Suite 210
Boca Raton, FL 33431
Tel.: (561) 989-9080
Fax: (561) 989-9020
By:  *s/* Joshua A. Katz
   James D. Sallah, Esq.
   Fla. Bar No. 0092584
   Email: jds@sallahlaw.com
   Joshua A. Katz, Esq.
   Fla. Bar No. 0848301
   Email: jak@sallahlaw.com

**Certificate of Service**

   I certify that on October 21, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

        /s/Joshua A. Katz
        **Joshua A. Katz, Esq.**