# Exhibit 4

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF
## ARC GLOBAL INVESTMENTS II LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT of ARC GLOBAL INVESTMENTS II LLC, a Delaware limited liability company (the "Company"), dated as of August 4, 2021, is by and among the persons set forth on Schedule A attached hereto (each a "Member" and, collectively, the "Members").

WHEREAS, the Company was formed as a Delaware limited liability company pursuant to the Certificate of Formation of the Company filed with the Office of the Secretary of State of the State of Delaware on December 11, 2020 (as the same may be amended or amended and restated from time to time in accordance with the Act (as defined below), the "Certificate"); and

WHEREAS, the Members desire to enter into this Agreement in order to, among other things, (i) permit the Company to acquire, own and hold certain shares of Class B common stock and private placement units of Digital World Acquisition Corp., a Delaware corporation, or any successor corporation, and (ii) set forth the terms and conditions for the governance of the business and affairs of the Company.

NOW, THEREFORE, in consideration of the premises set forth above, which are incorporated as part of this Agreement as if set forth below, and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

The following capitalized terms used in this Agreement have the respective meanings ascribed to them in this Article I.

"Act" means the Delaware Limited Liability Company Act, 6 Del. Code § 18-101 et seq. as in effect on the date hereof and as from time to time amended and in effect.

"Affiliate" means, with respect to any specified Person or entity, any Person or entity that directly or indirectly controls, is controlled by, or is under common control with such specified Person or entity and, with respect to a specified Person that is an individual, such Person's Immediate Family Members. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; *provided*, *however*, that the Company and its subsidiary (such subsidiary being the SPAC) do not constitute Affiliates of the Managing Member or any of his respective Affiliates for purposes of this Agreement.

"Agreement" means this Limited Liability Company Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Business Combination" means the initial business combination of the SPAC.

"Capital Account" means a separate account maintained for each Member and adjusted in accordance with Treasury Regulations under Section 704 of the Code.

"Capital Contribution" means any contribution by a Member to the capital of the Company.

"Carrying Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, however, that (i) the initial Carrying Value of any asset contributed to the Company shall be adjusted to equal its gross fair market value (determined by the Managing Member) at the time of its contribution and (ii) the Carrying Values of all assets held by the Company shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account) upon an election by the Company to revalue its property in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*f*).  The Carrying Value of any asset whose Carrying Value was adjusted pursuant to the preceding sentence thereafter shall be adjusted in accordance with the provisions of Treasury Regulation Section 1.704-1(b)(2)(iv)(*g*).

"Cause" shall be deemed to exist, for purposes of Section 8.02, upon the occurrence of any one of the following: (a) a Managing Member's conviction or entry of nolo contendere to any felony or a crime involving moral turpitude, fraud or embezzlement of Company property; or (b) a Managing Member's gross negligence or willful misconduct, or continued failure to perform material duties required as Managing Member of the Company under this Agreement; provided, however, that in the case of the conduct described in this clause (b), such conduct shall only constitute "Cause" if Members holding 80% of the Residual Percentages, excluding the Residual Percentages of the Managing Member and his Affiliates, provide written notice to the Managing Member of the alleged conduct described in this clause (b) (which notice must disclose in reasonable detail the nature of the alleged conduct) and the Managing Member does not cure such alleged conduct within 15 days following such notice.

"Certificate" has the meaning set forth in the preamble.

"Change in Investment" has the meaning set forth in Section 3.05.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" has the meaning set forth in the preamble.

"Defaulting Member" means a Member who fails to timely make all or any portion of the Capital Contribution required to be made by such Member under this Agreement.

"Fiscal Year" shall mean the year ending on December 31.

"Founder Shares" has the meaning ascribed to such term in Section 2.04.

"Founder Shares Percentage" means the percentage interest attributable to a Member's interest in the Founder Shares as set forth on Schedule A, as amended from time to time, and subject to adjustment pursuant to Article VIII hereof.

"Immediate Family Member" means with respect to any Member, his or her spouse, children, grandchildren, parents, siblings, any lineal descendant of the specified Person or any trust for the benefit of any of the foregoing Persons.

"Indemnified Person" has the meaning ascribed to such term in Section 6.06.

"IPO" has the meaning ascribed to such term in Section 2.04.

"Liquidator" means any Managing Member liquidating the assets of the Company pursuant to Article IX.

"Lockup Period" means such period(s) of time that the Founder Shares and/or the Private Placement Units may not be transferred, with any such transfer restrictions as described in the Registration Statement or as set forth in any other written agreement entered into in connection with the Business Combination.

"Managing Member" has the meaning ascribed to such term in Section 2.06.

"Member" means the Persons set forth on Schedule A and any Person or entity who becomes an additional or substitute Member as permitted by this Agreement, in such Person's or entity's capacity as a Member of the Company.  "Members" shall refer collectively to all such Persons or entities in their capacities as Members.

"Membership Interest" means any interest of a Member in the Company, including the rights, if any, to receive distributions, whether in cash or in kind, attributable to a Member's Founder Shares Percentage, Private Placement Units Percentage or Residual Percentage.

"Net Profits" and "Net Losses" mean the taxable income or loss, as the case may be, for a period as determined in accordance with Code Section 703(a) computed with the following adjustments:

(i)  Items of gain, loss, and deduction shall be computed based upon the Carrying Values of the Company's assets (in accordance with Treasury Regulation Sections 1.704(b)(2)(iv)(*g*) and/or 1.704-3(d)) rather than upon the assets' adjusted bases for federal income tax purposes.

(ii)  Any tax-exempt income received by the Company shall be included as an item of gross income;

(iii)  The amount of any adjustments to the Carrying Values of any assets of the Company pursuant to Code Section 743 shall not be taken into account except to the extent provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*);

(iv)  Any expenditure of the Company described in Code Section 705(a)(2)(B) (including any expenditures treated as being described in Code Section 705(a)(2)(B) pursuant to Treasury Regulations under Code Section 704(b)) shall be treated as a deductible expense;

(v)  The amount of items of income, gain, loss or deduction specially allocated to any Member pursuant to Section 5.02 shall not be included in the computation;

(vi)  The amount of any unrealized gain or unrealized loss attributable to an asset at the time it is distributed in-kind to a Member shall be included in the computation as an item of income or loss, respectively; and

(vii)        The amount of any unrealized gain or unrealized loss with respect to the assets of the Company that is reflected in an adjustment to the Carrying Values of the Company's assets pursuant to clause (ii) of the definition of "Carrying Value" shall be included in the computation as items of income or loss, respectively.

"Overallotment Shares" shall mean any Founder Shares that the Company is required to forfeit if the underwriters of the IPO do not fully exercise their over-allotment option.

"Partnership Representative" has the meaning ascribed to such term in Section 7.02.

"Permitted Transferee" means a Transfer, by a Member, (a) (i) to any of the SPAC's officers, directors or employees, (ii) any Affiliates or Immediate Family Members of any of the SPAC's officers, directors or employees, or (iii) to any other Member or an Affiliate or employee of another Member, (b) in the case of any particular Member, to any Affiliate of such Member or any employee of such Member or of any of its Affiliates; (c) in the case of an individual Member, by gift to an Immediate Family Member or to a charitable organization; (d) in the case of an individual Member, to any Person who is a transferee by virtue of laws of descent and distribution upon death of the individual Member; (e) in the case of an individual Member, to any Person who is a transferee pursuant to a qualified domestic relations order; (f) a family trust, foundation or partnership established for the exclusive benefit of a Member, any of his, her or its Affiliates or any of their respective Immediate Family Members; (g) to any Person approved in writing by the Managing Member or (h) to any Person by virtue of the laws of Delaware or under the terms of this Agreement; provided, however, that these Permitted Transferees must enter into a written agreement agreeing to be bound by this Agreement.

"Person" shall mean any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or governmental entity.

"Private Placement Units" has the meaning ascribed to such term in Section 2.04.

"Private Placement Units Percentage" means the percentage interest attributable to a Member's interest in the Private Placement Units as set forth on Schedule A, as amended from time to time, and subject to adjustment pursuant to Article VIII hereof.

"Registration Statement" means the registration statement on Form S-1 filed by the SPAC with the Securities and Exchange Commission for the issuance of its securities, as it may be amended from time to time.

"Residual Percentage" means the percentage interest attributable to a Member's residual interest in the Company as set forth on Schedule A, as amended from time to time, representing such Member's proportionate Capital Contribution.

"Securities Act" means the Securities Act of 1933, as amended.

"SPAC" has the meaning ascribed to such term in Section 2.04.

"Transfer" and any grammatical variation thereof, as to any Membership Interest, shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way (whether voluntarily, involuntarily or by operation of law) thereof.

## ARTICLE II

## GENERAL PROVISIONS

2.01    Name of the Limited Liability Company.   The name of the Company is ARC GLOBAL INVESTMENTS II LLC.  The name of the Company may be changed at any time or from time to time by the Managing Member.

2.02    Registered Agent for Service of Process; Registered Office.  The name of the resident agent for service of process for the Company and the address of the registered office of the Company in the State of Delaware shall be as set forth in the Certificate.  The Managing Member may establish places of business of the Company within and without the State of Delaware, as and when required by the Company's business and in furtherance of its purposes set forth in Section 2.04 hereof, and may appoint (or cause the appointment of) agents for service of process in all jurisdictions in which the Company shall conduct business.  The Managing Member may change from time to time the resident agent for service of process, or the location of the Company's registered office in Delaware.

2.03    Certain Filings; Organization.  The Managing Member is hereby designated as an "authorized person" within the meaning of the Act.  The Managing Member shall cause to be filed such certificates and documents as may be necessary or appropriate to comply with the Act and any other applicable requirements for the formation, continuation and operation of a limited liability company in accordance with the laws of the State of Delaware and any other jurisdictions in which the Company may conduct business, and shall continue to do so for so long as the Company conducts business therein.

2.04    Purposes; Powers.  The Company may engage in any business or activity in which a limited liability company organized under the laws of the State of Delaware may lawfully engage, and shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act (including the borrowing of money and the issuance of guarantees of indebtedness of other Persons).  Without limiting the generality of the above, the Company may (i) take any action in preparation for, or in connection with, an initial public offering ("IPO") of the securities of Digital World Acquisition Corp., a Delaware corporation (or any successor entity) (the "SPAC") to the public pursuant to the Registration Statement; and (ii) purchase and hold certain SPAC securities including: (x) 8,570,000 shares of Class B common stock of the SPAC (such shares purchased and held by the Company from and since the time of its formation, "Founder Shares") and (y) 1,174,109 placement units (1,320,359 placement units in the event the over-allotment option is exercised in full by the underwriters of the IPO), with each unit consisting of one share of Class A common stock of the SPAC and one-half (1/2) of one redeemable warrant to purchase one share of Class A common stock of the SPAC (the "Private Placement Units").  In addition, and notwithstanding the foregoing, each Member acknowledges that up to 1,125,000 Founder Shares acquired by the Company are subject to forfeiture (as

described in Section 3.04 below) in the event the over-allotment option is not exercised by the underwriters of the IPO.

2.05    <u>Members</u>.

(a)    The name, Capital Contribution, Founder Shares Percentage, Private Placement Units Percentage and/or Residual Percentage (as the case may be) of each Member of the Company are set forth on <u>Schedule A</u> hereto. Notwithstanding the foregoing (i) the Managing Member alone shall maintain a confidential <u>Schedule A</u>, containing the information set forth in the form of <u>Schedule A</u> attached hereto, indicating all of the foregoing items as allocated among all the Members and (ii) each particular Member (other than the Managing Member) shall be provided with a redacted <u>Schedule A</u> indicating the Capital Contribution, Founder's Share Percentage, Private Placement Units Percentage and/or Residual Percentage to his, her or its Membership Interest alone, and no Member shall have the right to be provided with the complete <u>Schedule A</u> maintained by the Managing Member.

(b)    Additional Members may only be admitted to the Company in accordance with Section 8.03.

(c)    Except as expressly set forth in this Agreement, no Member shall have the right to vote, under the Act or otherwise, on any matter regarding the conduct or management of the business of the Company.

2.06    <u>Designation of Managing Member</u>. Patrick Orlando is hereby designated as the "<u>Managing Member</u>" of the Company.  The Managing Member may withdraw or be removed as a Managing Member of the Company only in the manner specified in Section 8.02.

2.07    <u>Managing Member as Member</u>.   The Managing Member may hold a pecuniary interest in the Company as a Member.

2.08    <u>Liability of Member and Managing Member</u>.  Except as otherwise expressly provided by non-waivable provisions of the Act or other applicable law, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Members or the Managing Member shall be obligated personally for any such debt, obligation or liability of the Company by reason of being a Member or Managing Member of the Company.  Without limiting the foregoing, (i) no Member, in his, her or its capacity as a Member, shall have any liability to restore any negative balance in his, her or its Capital Account, (ii) the failure of the Company to observe any formalities or requirements relating to exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members or Managing Member for the debts, obligations or liabilities of the Company and (iii) under applicable law, the Members may, under certain circumstances, be liable to the Company to the extent of previous distributions made to them in the event that the Company does not have sufficient assets to discharge its liabilities.

2.09    <u>No Partnership</u>.  The Company is not intended to be a general partnership, limited partnership or joint venture, and no Member shall be considered to be a partner or joint venturer of any other Member, for any purposes other than income tax purposes, and this Agreement shall not be construed to suggest otherwise.

2.10   <u>Title to Company Property</u>.  All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property.  The Company may hold any of its assets in its own name or in the name of its nominee, which nominee may be one or more trusts.  Any property held by a nominee trust for the benefit of the Company shall, for purposes of this Agreement, be treated as if such property were directly owned by the Company.

2.11   <u>Nature of Member's Interest</u>.  The interests of all of the Members in the Company are personal property and shall not, under any circumstances, be considered real property.

2.12   <u>Confidentiality</u>.  Each Member agrees that the information relating to the business and operations of the Company and the SPAC including, without limitation, reports, financial information, trade secrets, research information, finances and financial projections, current or future business plans and models and other business or operational information (the "<u>Confidential Information</u>"), regardless of whether such information is designated as "confidential information" at the time of its disclosure, is confidential and proprietary.  Each Member agrees not to disclose the Confidential Information, except (a) to employees, officers, directors and advisors having a "need-to-know" such Confidential Information in connection with the transactions contemplated hereby who have undertaken an obligation (pursuant to a services agreement or otherwise) or agreed to maintain the confidentiality of the Confidential Information (the "<u>Authorized Disclosees</u>") or (b) to the extent such Confidential Information is otherwise publicly available without any violation of this Section 2.12 by such Member or any of its Authorized Disclosees.  Each Member agrees to take all steps reasonably necessary to protect the secrecy of the Confidential Information, and to prevent the Confidential Information from falling into the public domain or into the possession of unauthorized persons.  Each Member acknowledges that the breach of this Section 2.12 will cause irreparable damage to the Company and the SPAC for which monetary damages are insufficient.  As such, in the event of breach or threatened breach of this Section 2.12, each Member acknowledges and agrees that the Company shall have the right to obtain equitable relief, in addition to any other remedy at law, and the breaching Member shall not claim as a defense thereto that the Company has an adequate remedy at law and shall not require the posting of bond therefor.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; OVERALLOTMENT SHARES

3.01   <u>Capital Contributions</u>.  Each Member has agreed to contribute the Capital Contribution to the capital of the Company (if any) as set forth in <u>Schedule A</u> with respect to each such Member. On or before the date the Company purchases the Private Placement Units, and at such time(s) requested by the Managing Member, each Member shall contribute to the Company's bank account an amount equal to such Member's Capital Contribution (if any) as set forth in <u>Schedule A</u>.  In the event a Member fails to contribute such Member's portion of the Capital Contribution, the Defaulting Member shall forfeit such Member's Membership Interest (including any right, title or interest in and to his, her or its Founder Shares Percentage, Private Placement Units Percentage and/or Residual Percentage, as the case may be) and will cease to be a Member of the Company for any purpose.  The Managing Member is authorized to amend <u>Schedule A</u> to reflect such removal.  Other than as set forth in this Section 3.01, no Member shall be obligated to provide any Capital Contributions to the Company.  No Member shall be obligated to make any loan to the Company.

3.02    No Interest on Capital Contributions.  No interest shall accrue on any Capital Contribution to the Company, and no Member shall have the right to withdraw or to be repaid any Capital Contribution made by him, her or it or to receive any other payment in respect of his, her or its Membership Interest in the Company, including, without limitation, as a result of the withdrawal or resignation of such Member from the Company (including any payment contemplated by Section 18-604 of the Act, and this Section 3.02 shall expressly constitute "provision otherwise" for the purposes of Section 18-604 of the Act), except as specifically provided in this Agreement.

3.03    Failure to Contribute Capital. The forfeiture set forth in Section 3.01 constitutes the sole remedy of the Company or any of the Members with respect to the Defaulting Member's failure to contribute such Member's Capital Contribution.  The Managing Member may amend Schedule A of this Agreement as necessary to reflect that such Defaulting Member is no longer a Member.

3.04    Forfeiture of Overallotment Shares.  In the event the Company is required to forfeit any or all of the Overallotment Shares because the underwriters failed to exercise the over-allotment option in full, then such forfeited shares shall be allocated among the Members in proportion to the number of Founder Shares designated as "Overallotment Shares" with respect to each Member as set forth on Schedule A. The Managing Member may amend Schedule A hereto as necessary to reflect this Section 3.04.

3.05    Changes in Investment.  If prior to the Business Combination, the Managing Member deems it necessary in order to facilitate the Business Combination by the SPAC for the Company to forfeit, transfer, exchange or amend the terms of all or any portion of the Company's Founder Shares or Private Placement Units or to enter into any other arrangements with respect to the Founder Shares or Private Placement Units to facilitate the consummation of the Business Combination, including voting in favor of any amendment to the terms of the Founder Shares or Private Placement Units (each, a "Change in Investment"), the Managing Member shall enter into any such agreement or arrangement involving a Change in Investment (including any amendment to this Agreement), vote in favor of any proposal involving a Change in Investment or otherwise facilitate or take any action to affect or permit any Change in Investment without the consent of any other Member; provided, however, that to the extent any Change in Investment would affect any Member's or group of Members' Membership Interests, in each case disproportionate to all Members, the Managing Member shall receive the prior written consent of each such Member(s) disproportionately affected. In the event Founder Shares (other than the Overallotment Shares), Private Placement Units or any other securities held by the Company are forfeited or transferred as part of the Business Combination, the Managing Member shall allocate such forfeited or transferred securities among the Members in proportion to the percentage interest(s) to which such securities relate.  By way of example, and without limiting the foregoing, if the Company forfeits a portion of its Founder Shares (other than the Overallotment Shares), the forfeited Founder Shares shall be allocated among the Members in proportion to their Founder Shares Percentages.

**ARTICLE IV**
**DISTRIBUTIONS**

4.01    Distributions. (a) Except as otherwise provided in this Agreement (including, without limitation, Sections 4.01(b), 4.02 and 9.02), distributable assets of the Company shall be

distributed to the Members at such times prior to the dissolution and liquidation of the Company as shall be determined by the Managing Member.  Any such distributions shall be made as follows:

        (i)      Distributions attributable to the Founder Shares shall be made pro rata to each Member in accordance with his, her or its Founder Shares Percentage;

        (ii)     Distributions attributable to the Private Placement Units shall be made pro rata to each Member in accordance with his, her or its Private Placement Units Percentage; and

        (iii)    All other distributions shall be made pro rata to each Member in accordance with his, her or its Residual Percentage.

        (b)     Except as otherwise provided in this Agreement, and unless otherwise prohibited by law, the Managing Member shall use his best efforts to cause the Company to distribute no later than 10 days following the Business Combination, the Private Placement Units and the Founder Shares, in each case subject to the terms of any applicable Lockup Periods, and provided that the Members execute any reasonably required documentation including a lockup agreement. The Managing Member shall in no event fail to distribute any securities held by the Company following the Business Combination unless in his good faith determination such distribution would not be permitted by law or would not be practicable (for example, because such securities have been placed into an earn-out escrow or similar escrow in connection with the Business Combination), and it is the intention of the parties hereto that all securities held by the Company be distributed out as soon as reasonably practicable following the Business Combination.

        4.02    <u>Withholding and Other Taxes</u>.  If the Managing Member determines in good faith that there is a material possibility that the Company may be obligated to pay (or collect and pay over) the amount of any tax with respect to any Member's share of any income or distributions from the Company, then at the Managing Member's election, (i) the Company shall pay (or collect and pay over) the amount of such tax to the appropriate taxing authority or (ii) if there is no adequate source of cash at the Company level to pay any such tax (determined in good faith by the Managing Member), then the Managing Member may require any such Member to pay an amount equal to such taxes to the Company on or prior to the date any such taxes are due.  Any amounts so paid pursuant to the foregoing clause (i) shall be treated as having been distributed to the relevant Member(s) in respect of which such tax is due and shall reduce future distributions by such amount to such Member(s) accordingly.

        4.03    <u>Distribution of Assets in Kind</u>.  Prior to dissolution of the Company, if any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their fair market value on the date of distribution as determined by the Managing Member.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Managing Member, receive separate assets of the Company and not an interest as a tenant-in-common or other undivided interest with other Members so entitled in any asset being distributed, notwithstanding anything to the contrary in Section 18-605 of the Act.  Each Member acknowledges that any securities of the SPAC it receives may be subject to Lockup Periods.

4.04   <u>Limitations on Distributions</u>.   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make any distribution to a Member if such distribution would violate Section 18-607 or Section 18-804 of the Act.

## ARTICLE V
## ALLOCATION OF NET PROFITS AND NET LOSSES

5.01   <u>Basic Allocations</u>.   Net Profits, Net Losses and, to the extent necessary, individual items thereof shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal proportionately to the distributions that would be made to such Member pursuant to Section 9.02 of this Agreement if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their fair market values (as determined in good faith by the Managing Member), all Company liabilities were satisfied and the net assets of the Company were distributed in accordance with Section 9.02 to the Members immediately after making such allocation.

5.02   <u>Regulatory Allocations</u>.   Notwithstanding the provisions of Section 5.01 above, any allocation required to be made under Treasury Regulation Section 1.704 (including, but not limited to, allocations relating to "minimum gain chargeback", "nonrecourse deductions", "qualified income offset") and Code Section 704(c) shall be made prior to the allocation set forth in Section 5.01.

5.03   <u>Timing of Allocations</u>.   Allocations of Net Profits, Net Losses and other items of income, gain, loss and deduction pursuant to this Article V shall be made for each Fiscal Year of the Company as of the end of such Fiscal Year; <u>provided</u>, <u>however</u>, that if the Carrying Value of the assets of the Company are adjusted in accordance with clause (ii) of the definition of "Carrying Value," the date of such adjustment shall be considered to be the end of a fiscal year for purposes of computing and allocating such Net Profits, Net Losses and other items of income, gain, loss and deduction.

## ARTICLE VI
## MANAGEMENT

6.01   <u>Management of the Company</u>.

(a)   Subject to the provisions of this Agreement and the Act, the management and control of the business and affairs of the Company shall be vested in the Managing Member who shall be deemed to be and shall have all of the rights, powers, duties and responsibilities of a "manager" within the meaning of the Act.   Except as otherwise specifically provided herein, the Managing Member shall have full, exclusive and complete discretion to manage the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take such actions as the Managing Member deems necessary or appropriate to accomplish the purpose of the Company as set forth herein.   Any action taken or decision made by the Managing Member on behalf of the Company shall be conclusive evidence that such action or decision was approved.

(b)   All management and other responsibilities not specifically reserved to the Members in this Agreement shall be vested in the Managing Member, and the Members shall have

no voting rights hereunder or under the Act except as specifically provided in this Agreement. Except as may be expressly provided otherwise elsewhere in this Agreement, no Member (other than a Member who is also a Managing Member) shall have any right, power or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. Each Member agrees to defend, indemnify and hold harmless the Company, the Managing Member and the other Members and their respective officers, directors, stockholders, employees, general and limited partners, member, managers, trustees, agents and Affiliates against any claim, loss, damage, liability, cost or expense of any nature, arising out of, or resulting or relating to, any action taken by such Member in violation of the provisions of this Section 6.01(b). Decisions or actions taken by the Managing Member in accordance with this Agreement shall constitute decisions or actions of the Company and shall be binding on each Member, and officer and employee, if any, of the Company.

(c)     Specifically, but not by way of limitation, but subject to all other provisions of this Agreement (including without limitation Section 6.03), the Managing Member shall be authorized in the name of and on behalf of the Company to do all things necessary or appropriate, to carry on the business and purposes of the Company, including without limitation, pay any and all fees and to make any and all expenditures which the Managing Member deems necessary or appropriate in connection with the formation of the Company, general and administrative expenses of the Company, the management of the affairs of the Company, and the carrying out of their obligations and responsibilities under this Agreement or any other agreement to which the Company is a party, including, without limitation, fees, reimbursements and expenditures payable to any Member or Managing Member or their respective Affiliates. Notwithstanding anything herein to the contrary, the Managing Member may not enter into any agreement (x) that would cause any Member to become personally liable on or in respect of or to guarantee any Indebtedness of the Company without such Member's consent or (y) that is not nonrecourse to such Member without such Member's consent.

(d)     Neither the Managing Member nor his Affiliates shall be required to devote their full time to the business of the Company, but shall devote so much of their time and efforts to the affairs of the Company as may in their judgment be necessary to accomplish the purposes of the Company.

(e)     At any time and from time to time, the Managing Member may appoint such officers or senior executives of the Company with such duties and responsibilities as may be authorized by the Managing Member. The Managing Member may remove any such officers or senior executives at any time in his sole discretion.

6.02   <u>Compensation of Managing Member and Members</u>.  No payment shall be made by the Company to a Managing Member or Member for such Managing Member's or Member's services as a Managing Member or Member, as the case may be, except as may otherwise be specifically provided in this Agreement.  In addition, neither the Managing Member nor any of his Affiliates shall receive from the SPAC any financial, advisory or similar fees or any compensation of any kind in connection with the Business Combination or any financing conducted in connection therewith; <u>provided</u> <u>however</u>, that the Managing Member and/or his Affiliates may receive compensation under an employment agreement, consulting agreement, services agreement or other agreement with the SPAC and/or any Affiliate of the SPAC to provide ongoing services to the SPAC and/or such Affiliate for any period beginning on or after the date of the Business

Combination. The Managing Member shall be entitled to reimbursement from the Company for all out of pocket expenses incurred by him in managing and conducting the business and affairs of the Company.  The Managing Member shall determine which expenses, if any, are allocable to the Company in a manner that is fair and reasonable to the Managing Member and the Company, and if such allocation is made in good faith, it shall be conclusive in the absence of manifest error.

6.03    Binding the Company.  The signature of the Managing Member on any agreement, contract, instrument or other document shall be sufficient to bind the Company in respect thereof and conclusively evidence the authority of the Managing Member and the Company with respect thereto, and no third party need look to any other evidence or require the joinder or consent of any other party.  Except as otherwise specifically provided in this Agreement, no Member (other than a Member who is also a Managing Member) shall have the authority to bind the Company.

6.04    Intentionally Omitted.

6.05    Exculpation.   No Indemnified Person (as defined below) shall have any liability to the Company or to any Member or Managing Member for any loss suffered by the Company which arises out of any action or inaction by such Indemnified Person with respect to the Company (i) if such Indemnified Person so acted or omitted to act (A) in the good faith and reasonable belief that such course of conduct was in, or was not opposed to, the best interests of the Company, or (B) in reliance on the provisions of this Agreement, and (ii) such course of conduct did not constitute gross negligence, fraud, willful malfeasance or material breach of this Agreement by such Indemnified Person, nor shall any Indemnified Person be liable to the Company or any Member or Managing Member for losses due to such mistakes, action, or inaction or to the negligence, dishonesty or bad faith of any broker or other agent of the Company, provided that they shall have been selected in good faith.  The Managing Member may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any reasonable action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected in good faith.

6.06    Indemnification. The Company shall indemnify, out of the assets of the Company only (including cash and the proceeds from liability insurance, if any), and hold harmless each Indemnified Person, to the fullest extent permitted by applicable law, from and in respect of all (a) reasonable fees, judgments, fines, costs, and expenses (including reasonable attorneys' fees) paid in connection with or resulting from any claim, demand, action, suit or proceeding, and any appeal therefrom, relating to this Agreement or the activities of the Company against any Indemnified Person, its properties, business, or affairs, (b) losses or damages resulting from such claims, demands, actions, suits or proceedings, and any appeal therefrom, including any amounts paid in settlement or compromise (if recommended by attorneys for the Company) of any such claim, demand, action, suit or proceeding, and any appeal therefrom, and (c) losses or damages (including reasonable attorneys' fees and costs) resulting from claims, demands, actions, suits or proceedings arising from or relating to the acts of the Indemnified Person in preparing and filing the Registration Statement, seeking and consummating the Business Combination on behalf of the SPAC or any other activities relating to such Indemnified Person's responsibilities to the SPAC; provided, however, that this indemnity shall not extend to the Indemnified Person if (i) the Indemnified Person acted with (A) willful misconduct or gross negligence, or (B) with respect to any criminal action or proceeding, the Indemnified Person had reasonable cause to believe such Indemnified Person's conduct was unlawful.  The term "Indemnified Person" shall mean: (a) each

Person that is or was, or has agreed to become, a Managing Member or Member, or is or was serving, or has agreed to serve, at the request of the Company, as a director, officer, manager or trustee of, or in a similar capacity with, another corporation, partnership, limited liability company, joint venture, trust or other enterprise; and (b) the Liquidator, if any.

6.07    No Prohibition Against Other Business Ventures.

(a)   The Members and their respective Affiliates may engage and hold interests in other business ventures of every kind and description for their own accounts, engage in other business activities, and/or establish, manage and provide investment advice to other public or private investment funds and/or managed accounts ("Other Funds"), without having to account to the Company, the SPAC or any Member for any profits or other benefits derived therefrom and without incurring any obligation to offer any interest in any such activity to the Company, the SPAC or any Member.

(b)     Without limiting the generality of Section 6.07(a) above, the Members and respective Affiliates of the Members and/or Other Funds may make direct investments in securities and instruments that are the same as, or substantially similar to, those in which the Company and the SPAC invest or intend to invest at such times and in such amounts as they may each determine in their respective discretion.   Except as described in the Registration Statement, neither the Members nor any Affiliate of the Members and/or the Other Funds is obligated to offer the Company or the SPAC any investment opportunities that may be offered to the Other Funds, or any investment opportunities in which the Members or Affiliates of the Members and/or the Other Funds may invest in on a proprietary basis, and any decision to do so will be entirely within their discretion.

## ARTICLE VII
## BOOKS AND RECORDS; FISCAL MATTERS

7.01    Books and Records.   The Managing Member shall keep or cause to be kept complete and accurate books and records with respect to the operations of the Company.   Subject to the provisions of this Agreement, such books and records shall be maintained and be available, in addition to any documents and information required to be made available to a Member under the Act, at the principal office of the Company or in such other location as the Managing Member may designate, for examination and copying during ordinary business hours upon reasonable notice to the Company by any Member, or his, her or its duly authorized representative, at such Member's reasonable request and at such Member's own expense, as applicable, for any purpose reasonably related to such Member's interest in the Company.

7.02    Partnership Representative.   The Managing Member shall be the "partnership representative" pursuant to Section 6223(a) of the Code (the "Partnership Representative"). The Partnership Representative shall cause the Company's accountant to prepare, and timely file, all Company tax returns, and shall timely make all other filings required by any governmental authority having jurisdiction to require such filing, the cost of which shall be borne by the Company. The Partnership Representative shall also cause to be delivered to the Members such information relating to the Company as the Managing Member determines is necessary for the Members to complete their federal, state and/or local income tax returns that include such tax year. No election shall be made by the Company, the Partnership Representative or any Member to be

excluded from the application of the provisions of subchapter K of the Code or from any similar provision of state tax laws.

      7.03    <u>Bank Accounts</u>.  The Managing Member may cause the Company to open and maintain one or more accounts with such financial institutions as the Managing Member may determine to be necessary or advisable.  The Managing Member is authorized to execute checks and other documents on behalf of the Company with respect to such accounts.  To the extent deemed necessary or advisable by the Managing Member, the Company shall adopt resolutions more specifically effectuating the foregoing provisions of this Section 7.03.

**ARTICLE VIII**
**TRANSFERS OF INTERESTS; TRANSFERS TO SERVICE PROVIDERS**

      8.01    <u>Restrictions on Transfer of Interests by Members</u>.

      (a)    No Member may Transfer any of his, her or its Membership Interests, other than a Transfer to a Permitted Transferee who agrees in writing to be bound by this Agreement.  A Member seeking to Transfer to a Permitted Transferee shall provide written notice to the Company at least ten days prior to such proposed Transfer.

      (b)    Any Transfer in contravention of any of the provisions of this Agreement shall be null and void and ineffective to Transfer any Member's Membership Interest, or any portion thereof, and shall not bind, or be recognized by, or on the books of, the Company, and any purported transferee in such transaction shall not be or be treated as or deemed to be a Member (or an assignee within the meaning of Section 18-702 of the Act) for any purpose. In the event any Member shall at any time Transfer a Membership Interest in the Company, or any interest therein, in contravention of any of the provisions of this Agreement, then each other Member shall, in addition to all rights and remedies at law and equity, be entitled to a decree or order restraining and enjoining such transaction, and the offending Member shall not plead in defense thereto that there would be an adequate remedy at law; it being expressly hereby acknowledged and agreed that damages at law would be an inadequate remedy for a breach or threatened breach of the provisions of this Agreement concerning such transactions.

      (c)    Notwithstanding the provisions of this Article VIII, the Founder Shares, Private Placement Units and the shares of Class A common stock of the SPAC underlying such Private Placement Units are subject to certain Transfer restrictions (including Lockup Periods as defined herein) and forfeiture restrictions (including the Overallotment Shares forfeiture conditions).  No Member shall Transfer such Member's right to or interest in any such securities in violation of such agreements.  Any validly transferred securities shall continue to be subject to any and all forfeiture conditions described herein and in any other applicable agreement.

      (d)    <u>Intentionally Omitted</u>.

      (e)    Notwithstanding anything herein to the contrary, no transfer to a transferee shall be effective unless the transferee agrees in writing to become a party to this Agreement and to be treated hereunder as a Member for all purposes of this Agreement.

      8.02    <u>Withdrawal or Removal of the Managing Member</u>.

(a)     The Managing Member may voluntarily resign, withdraw or retire as Managing Member from the Company; provided however that prior to the date of the Business Combination, no such resignation, withdrawal or retirement shall be effective without the consent of the Members holding 66 2/3% of the Residual Percentages, excluding the Residual Percentage of the Managing Member and his Affiliates. If the Managing Member voluntarily resigns, withdraws or retires in accordance with this Section 8.02(a), then a successor Managing Member shall be appointed by the vote of Members holding 50.1% of the Residual Percentages.

(b)     The Managing Member may not be removed without Cause. The Managing Member may be removed for Cause, but only if (i) the requirements set forth in the definition of "Cause" set forth in Article I are first complied with and (ii) such removal is also approved by Members holding 80% of the Residual Percentages, excluding the Residual Percentages of the Managing Member and his Affiliates. If the Managing Member is removed for Cause, a successor Managing Member shall be appointed by the vote of the Members holding at least 50.1% of the Residual Percentages.

(c)     No resignation, removal or replacement of the Managing Member shall affect his rights as a Member of the Company.

8.03     Additional Members.  Additional Members may be admitted to the Company only upon the written consent of the Managing Member.  In connection with any such admission, this Agreement (including Schedule A) shall be amended to reflect the additional Member, his, her or its Capital Contribution, if any, his, her or its Founder Shares Percentage, Private Placement Units Percentage, Residual Percentage and any other rights and obligations of the additional Member. Each additional Member must agree to be bound by any transfer restrictions, voting arrangements and forfeiture requirements that are then applicable to the Founder Shares and Private Placement Units.

Each Member, and each Person or entity who is hereinafter admitted to the Company as a Member, hereby: (i) consents to the admission of any such third party admitted in compliance with this Agreement, and to any amendment to this Agreement which may be necessary or appropriate to reflect such admission, and (ii) acknowledges that, in connection with any admission of any such Person, such Member's interest in allocations of Net Profits and Net Losses, distributions and net proceeds upon liquidation of the Company, may be diluted or otherwise altered (subject to the provisions of this Section 8.03).

8.04     Transfers to Service Providers. At any time that the Company holds Founder Shares and/or Private Placement Units (or any securities into which such Founder Shares or Private Placement Units have been substituted for, exchanged for, converted into or subjected to any similar transaction), the Managing Member may allocate up to 100% of the number of Founder Shares and up to 100% of the Private Placement Units held by the Company immediately following the IPO (and after giving effect to any Overallotment Shares that may have been forfeited) to service providers to the SPAC without the consent of any other Member.  Such Membership Interests shall be deemed Transferred from all Members to such service providers pro rata in accordance with the relevant percentage(s) to which such Membership Interests relate. For example, if the Company Transfers to a service provider Membership Interests representing solely an allocation of Founder Shares, then such Membership Interests shall be Transferred by all Members in proportion to their Founder Shares Percentages. The Managing Member may make

such changes to <u>Schedule A</u> to reflect any Transfers permitted by this Section 8.04 as he deems necessary without the consent of any other Member.

## ARTICLE IX
## DISSOLUTION AND TERMINATION

9.01     <u>Events Causing Dissolution</u>.    The Company shall be dissolved and its affairs wound up:

(a)     At any time there are no Members of the Company, unless the Company is continued without dissolution in a manner permitted by the Act; or

(b)     Upon the election to dissolve the Company made in writing by the Managing Member; provided, however, that no such election may be made prior to the Business Combination.

9.02     <u>Distributions Upon Liquidation</u>.

(a)     Upon dissolution of the Company, the Liquidator shall satisfy liabilities owing to creditors whether by payment or the making of reasonable provision for payment thereof (including creating such reserves as may be required by non-waivable provisions of Section 18-804(b) of the Act or as the Liquidator otherwise deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company).

(b)     After paying such liabilities and providing for such reserves, and to the extent the following have not been previously distributed, the Liquidator shall cause (i) the Founder Shares or any proceeds attributable thereto (if any) to be distributed to the Members in accordance with the provisions of Section 4.01(a).

## ARTICLE X
## MISCELLANEOUS

10.01   <u>Notices</u>.  Any and all notices, requests, elections, consents or demands permitted or required to be made under this Agreement shall be given in writing, signed as required, and shall be delivered personally, or sent by registered or certified mail, or by overnight mail, Federal Express or other similar commercial overnight courier and shall be effective (a) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, (b) on the first business day after being sent by express mail, receipt confirmed or reputable commercial overnight delivery service providing a receipt for delivery, (c) on the date of actual hand delivery or (d) on the date of actual delivery if sent by any other method.  In order to be effective, all such notices shall be addressed, if to the Company, at its principal place of business, and if to a Member or a Managing Member, at the address set forth on the signature page of this Agreement or the last address on the Company's books.

10.02   <u>Word Meanings</u>.    The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  The singular shall include the plural and the

masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

10.03   <u>Binding Provisions</u>.   The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their respective successors, successors-in-title, heirs and assigns, and each and every successor-in-interest to any Member or Managing Member, whether such successor acquires such interest by way of gift, purchase, foreclosure, or by any other method, shall hold such interest subject to all of the terms and provisions of this Agreement.

10.04   <u>Applicable Law</u>.   This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of Delaware, including the Act, as interpreted by the courts of the State of Delaware, notwithstanding any rules regarding choice of law to the contrary.

10.05   <u>Counterparts; Facsimile Signatures</u>.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same document.  Each party to this Agreement may execute and deliver this Agreement by an executed signature page transmitted by facsimile or electronic mail, <u>provided</u> that such party promptly thereafter delivers an originally executed signature page.  Any failure to deliver such an originally executed signature page after delivering an executed signature page by facsimile, however, shall not affect the validity, legality or enforceability of this Agreement.

10.06   <u>Separability of Provisions</u>.  Each provision of this Agreement shall be considered separable.  To the extent that any provision of this Agreement is prohibited or ineffective under the Act or other applicable law, this Agreement shall be considered amended to the minimum extent possible in order to make the Agreement effective under the Act or such other applicable law (and, if the Act or such other applicable law is subsequently amended or interpreted in such manner as to make effective any provision of this Agreement that was formerly rendered invalid, such provision shall automatically be considered to be valid from the effective date of such amendment or interpretation).

10.07   <u>Section Titles</u>.   Article and Section titles are included herein for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

10.08   <u>Amendments</u>.  Except as otherwise specifically set forth in this Agreement, and subject to the remaining provisions of this Section 10.08, this Agreement may be amended, modified, waived or subjected to any similar action (any of the foregoing, an "<u>Amendment</u>") by the Managing Member in his sole discretion without the consent of the other Members; <u>provided</u>, <u>however</u>, that (i) any such Amendment that would materially and adversely affect any Member or group of Members in a manner disproportionate to the effect upon the remaining Members shall also require the prior written consent of all such Member(s) so disproportionately affected; (ii) no Amendment shall affect the requirement that any Member disproportionately affected by a Change in Investment proposal must consent to such proposal as described in Section 3.05 hereof; (iii) no Amendment of Section 6.05 or Section 6.06 shall affect or diminish in any way the rights of any Indemnified Person to exculpation or indemnification under the provisions of Section 6.05 and Section 6.06, respectively; (iv) no Amendment shall materially adversely affect a Member's right to receive distributions pursuant to Sections 4.01 and/or 9.02 hereof without such Member's prior

written consent or otherwise adversely affect the economic rights of the Members (except as may be otherwise contemplated by this Agreement); and (v) the definitions of "Cause" or "Permitted Transferee" may not be amended without the consent of Members holding 80% of the Residual Percentages. The Company will give prompt written notice to the Members of any Amendment to this Agreement.

10.09   Third Party Beneficiaries.  The provisions of this Agreement, including Article III, are not intended to be for the benefit of any creditor (other than a Member or Managing Member, in his, her or its capacity as such, who is a creditor) or other Person (other than a Member or Managing Member in his, her or its capacity as such) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any Member or Managing Member.

10.10   Entire Agreement.   This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

10.11   Waiver of Partition.  Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to partition the Company or any of its assets.  Accordingly, each Member agrees that he, she or it shall not, either directly or indirectly, take any action to require partition or appraisal of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his, her or its successors and assigns) accepts the provisions of the Agreement as his, her or its sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all right to file a complaint, institute or maintain any action or proceeding at law or in equity  for partition or to compel any sale or other liquidation with respect to his, her or its Membership Interest, in or with respect to, any assets or properties of the Company.

10.12   No Performance Waiver.  The failure of any Member or Managing Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's or Managing Member's right, as the case may be, to demand strict compliance in the future.

10.13   Trust Waiver.  Each Member hereby waives any and all right, title, interest or claim of any kind ("Claim") in or to any distribution of or from the trust account (the "Trust Account") to be established by the SPAC in which the proceeds of the IPO (including the deferred underwriters discounts and commissions) and the proceeds of the sale of the Private Placement Units by the SPAC to the Company are to be deposited, as described in greater detail in the Registration Statement, and hereby agrees not to seek recourse, reimbursement, payment or satisfaction for any Claim against the Trust Account for any reason whatsoever. This Section 10.13 shall not apply to any Claims a Member may have with respect to its ownership of the SPAC's public securities.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the date first above written.

**MANAGING MEMBER**

_____
                    Patrick Orlando

*[Execution Page for Managing Member Only]*

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the date first above written.

By:

_____
Signature

_____
Name

_____
Title

*[Execution Page for Other Members]*